### SAN RAFAEL ELEMENTARY SCHOOL DISTRICT, Plaintiff,

v.

### CALIFORNIA SPECIAL EDUCATION HEARING OFFICE, Defendant,

and

### Ak, a minor, Real Party in Interest.

### No. C 03–5783 VRW.

United States District Court, N.D. California.

March 28, 2007.

Janice L. Sperow, Roya Massoumi, Celia M. Ruiz, Ruiz & Sperow LLP, Emeryville, CA, for Plaintiff.

Michael Hersher, California Department of Education, Sacramento, CA, for Defendant.

Kathryn E. Dobel, Kathryn E. Dobel Law Offices, Berkeley, CA, for Real Party in Interest.

## ORDER

WALKER, Chief Judge.

On December 22, 2003, the San Rafael Elementary School District ("District") filed this action pursuant to 20 USC § 1415 seeking relief from a determination by the California Special Education Hearing office that the District had not provided a "free and appropriate public education" ("FAPE") to the real party in interest, AK, as required by the Individuals with Disabilities Education Act ("IDEA"). See Doc # 1, ¶¶ 37–49; 20 USC § 1400 et seq. The District also seeks declaratory relief pursuant to 28 USC § 2201(a). See id, ¶¶ 50–53. On December 30, 2004, the parties filed cross-motions for summary judgment. Doc ## 54, 60. On March 3, 2005, this court stayed the hearing on those motions pending a decision by the United States Supreme Court in *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), and on January 6, 2006, this court granted leave to file supplemental briefing regarding the effect of that decision on this case. Doc ## 115, 119. Both parties filed supplemental briefing, and on March 23, 2006, this court conducted a hearing on the motions for summary judgment and took the case under submission. See Doc ## 122, 123, 130. For the reasons stated below, this court GRANTS the District's motion for summary judgment and DENIES AK's cross-motion for summary judgment.

### I

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 USC § 1400(d)(1)(A). Accordingly, the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." *Honig v. Doe*, 484 U.S. 305, 310, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

■ Reviewing courts must inquire into a school district's procedural and substantive compliance with the IDEA. *Seattle Sch. Dist., No. 1 v. BS*, 82 F.3d 1493, 1498–99 (9th Cir.1996).

■ Procedurally, the IDEA requires school districts to identify children with special education needs and develop for them an individual education program (IEP) through an IEP team. See 20 USC § 1414. An IEP must define educational goals for the student as well as benchmarks for the student's progress, and the IEP team must evaluate the student's performance on those goals on at least an annual basis. See *id*. AK does not argue that the District failed to comply with the IDEA's procedural requirements.

Rather, the dispute centers on the IDEA's substantive requirements. Specifically, the IDEA requires an IEP to provide an identified special needs student with FAPE. 20 USC § 1400(d)(1)(A). FAPE is defined in the statute as "special education and related services" provided at "public expense" that conform to the "standards of the State educational agency" and the specific requirements for IEPs mandated by the IDEA. 20 USC § 1401(9). The term "special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings * * *" 20 USC § 1401(29). Yet neither the statute nor the legislative history of the IDEA precisely define what a school district must do

in order to provide a student with FAPE. Those standards have been developed through caselaw.

The leading case on the substantive requirements of the IDEA is *Bd of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 200, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), where the Supreme Court held that FAPE, under the IDEA's antecedent statute, the Education of the Handicapped Act, requires school districts only to provide a "basic floor of opportunity" for disabled students and that it is enough that an IEP be "reasonably calculated to enable the child to receive educational benefits." As such, school districts are not required to "maximize the potential of each handicapped child * * *" Id at 200, 102 S.Ct. 3034. Even so, while FAPE need not be the absolute best program for the child, "Congress did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial." *Amanda J v. Clark County School Dist.*, 267 F.3d 877, 890 (9th Cir.2001) (citing *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985)). Once those procedural and substantive requirements are met, "the State has complied with the obligations imposed by Congress and the courts can require no more." Id at 890 (citing *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034).

AK argues that Congress heightened the *Rowley* standard when it passed amendments to the IDEA in 1997. Doc # 61 at 24:3–6. Two of those 1997 amendments, according to AK, require that an IEP do more than just "provide some educational benefit." Doc # 61 at 23:27–24:11. In 20 USC § 1400(c)(5)(E)(1) (as it existed from 1997 to 2004), Congress states that education of the disabled will be more effective if personnel are trained to "ensure that [the disabled students] have the skills and knowledge necessary to enable them to meet developmental goals and, to the maximum extent possible, those challenging expectations that have been established for all children; and to be prepared to lead productive, independent adult lives, to the maximum extent possible." PL 105–17 § 601(c) (5)(E)(1), 111 Stat 339; Doc # 61 (AKs MSJ) at 24:3–6. In 20 USC § 1400(d)(1)(A) (as it existed from 1997 to 2004), the IDEA states that its purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services to meet their unique needs and prepare them for employment and independent living." PL 105–17 § 601(d)(1)(A); 111 Stat 42; Doc # 61 at 23:27–24:3.

■ Yet AK cites to no legal authority or legislative history that supports the proposition that these amendments have had any effect on the substantive standards articulated in *Rowley*. While AK cites to law review articles, the court is not persuaded these establish standards. See Doc # 86 at 24:6–11. First, Congress failed to mention that it was overturning such a well established precedent in the reports accompanying the amendments. See House Rep No 105–95 reprinted at 1997 USCCAN 2. While that alone is not dispositive, in 2006 the Ninth Circuit reaffirmed that the appropriate standard for determining whether an IEP provides FAPE is whether it is "reasonably calculated to enable the child to receive educational benefits." *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir.2006) (citing *Amanda J*, 267 F.3d at 890). Accordingly, this court agrees with the District that despite amendments made to the IDEA, the act does not require the District to maximize a student's potential, but only requires the District to

provide special needs students with educational benefits.

## II

The facts of this case are essentially undisputed. AK, born on August 27, 1993, is a boy from San Rafael, California who lives in the District and qualifies for special education services due to autistic behaviors. Doc # 54 (Dist MSJ) at 1:1–4. The District provided special education services to AK until February 2003, when, pursuant to an ongoing disagreement between the District and AK's parents over AK's educational needs, AK's parents placed him in the Devereux Glenholme School ("DGS"), a residential facility in Connecticut. Doc # 54 at 1:6–12.

AK's behavioral issues have been ongoing since he entered the public school system in 1996. Doc # 1–1 (HO's decision) at 2. From 1996 to 2000, AK transferred in and out of five different public schools and by the end of the 1999–2000 school year, "incidents of physical aggression and threats to attack or kill people and destroy places or things were frequent at school, home and in the community." Id at 3. Accordingly, AK's IEP team, assembled by the District, agreed to place him for the 2000–2001 school year at the Children's Learning Center (CLC), a local private school for children with special education needs. Id.

Upon enrollment at CLC and through early 2002, AK showed improvement. Id; Doc # 77, TR of 7/31/03, Test of Dr Ruth Serepca ("TRS") at 56:20–59:16. In January 2001, just before AK's annual IEP meeting, AK's parents expressed satisfaction over their son's placement at CLC and were "glad" AK was in a "safe appropriate educational setting." Id. AK's January 2001 IEP stated that AK "was meeting his grade-level standards for reading, language arts, and math, and he was completing tasks as directed." Id at 4 (parenthetical omitted). AK's January 2002 IEP findings were similar-AK performed at grade-level. Id.

Despite AK's academic success from Fall 2000 through January 2002, his behavior, particularly at home and in the community, continued to decline. Doc # 1–1 at 3–4; Doc # 54 at 1:16–17. AK's parents noted he was experiencing severe behavioral problems outside of school including incidents of:

> [G]rowling at others, being defiant and seriously noncompliant, shaking his finger in adults' faces at close proximity, threatening, yelling, ordering, stomping his feet to wake people, slamming doors, running out of the house, throwing objects or hitting objects to damage them, brandishing objects (e g broomsticks, wrenches) at people, throwing objects at people, hitting people, grabbing wrists, grabbing throats, kicking, attempting to bite, spitting, urinating on the floor and threatening to urinate in the car.

Id at 4.

In contrast, AK's behavior at school was much more controlled, and his problems were "not nearly at the level of physical agitation and physical aggression * * * seen at home." Id at 3–4. AK's January 2002 IEP report stated that although AK "was making verbal threats or reacting inappropriately at an average rate of about one time per week," his behavior was not "so severe or unmanageable as to prevent [him] from achieving academic progress at CLC." Id at 4; Doc # 73 Student Exhibit ("SE") 58 at 1. In light of AK's academic progress, the District decided to place AK in a different CLC classroom in order to "be with students closer in age and academic ability" and to provide "a more formal structure * * * and higher student demands." Id at 5, Doc # 61 at 7:15–17.

Notwithstanding AK's academic progress, in response to the concerns AK's

parents raised about behavior in the home and community, his IEP team also agreed to place AK in Therapeutic After School Care (TASC), a program designed to address socialization and recreational needs, for up to 3 hours per day, 4 days per week. Doc # 61 at 7:23–26; Doc # 73, SE 70 at 3. After changing classrooms and beginning TASC, AK took a turn for the worse behaviorally. Doc # 1–1 at 5, Doc # 61 at 8:11–20.

Responding to these behavioral problems, AK's parents hired a home aide worker, Reed Connell, to assist with AK at home. Doc # 61 at 8:20. Over the course of seven months, AK hit Reed with a coat hanger, a bat, a car door, a clock, swung a golf club at him, bit him, kicked his head, pulled his pony tail, pulled his beard, kicked his neck, scratched him, punched him, kicked him in the head while he was driving 60 mph on the freeway, threatened him with a razor, attacked him while he held AK's infant sister and drew blood on many occasions. Doc # 54 at 7:11–20. During this period, AK also chased his toddler sister, choked her, hit her and pushed her. Id at 7:18–20. AK even removed his sister from her crib in the middle of the night. Id at 7:21.

In the Fall of 2002, AK's behavioral decline culminated in two disturbing incidents. On October 3, 2002, CLC staff were forced to physically restrain AK "for his own safety." Doc # 1–1 at 6; Doc # 61 at 9:25–26. On October 17, 2002, while at TASC, AK grabbed Dr Jennifer Seymour by the throat and then headbutted, kicked and hit Dr Tennant. Id. AK threatened to "shave" one staff member and to "get a bat or knife." Id; see also Doc # 61 at 9:19–21. TASC and AK's parents agreed that AK would not return to TASC as long as he displayed such aggressive behaviors. Doc # 73, SE 127 at 2.

Academically, in the Fall of 2002, CLC noted a decrease in AK's performance from the previous school year. Doc # 1–1 at 6. According to his October 2002 CLC progress report, AK had demonstrated lack of motivation, lethargy and noncompliance with teacher demands. Id. As a result, "expectations for his work output were dramatically reduced." Id. AK's teacher testified, however, that by reducing demands on AK and increasing reinforcement, AK began to improve academically. Doc # 82, TR of 7/24/03, Test of Elisabeth Tyler ("TET") at 125:11–24. Indeed, a report prepared by AK's teacher for the January 2003 IEP meeting found that AK had met or exceeded 9 of the 12 goals from his 2002 IEP. Doc # 82, TET at 149:10–12; Doc # 71, District Exhibits ("DE") at D00241–42. Of the three goals that were not met, AK missed two of them by less than 4%. Id at 150:7–10. Similarly, AK's occupational therapist, Liz Isono, reported in January 2003 that AK had made gains in a variety of daily living skills. Doc # 1–1 at 8.

In response to AK's behavioral and academic decline, AK's mother requested an IEP meeting, which convened on December 13, 2002. Id at 7. His IEP team agreed that AK's "recent behaviors adversely impacted his progress at school" and that his IEP needed revision. Doc # 61 at 11:6–8. The parties, however, disagreed on the appropriate course of action and "whether [AK's] goals and objectives, particularly with respect to behavior and adaptive skills, should be written to apply across not only the school setting, but also the home and community settings." Doc # 1–1 at 9. AK's parents stated their belief that the only way to address AK's need to generalize across settings was through a residential placement. Id. The IEP team agreed to reconvene in January of 2003. Id.

During the January IEP meeting, Dr Ruth Serepca, AK's pediatric neuro-psychologist, stated that she believed that AK's need for constant structure, repetition and consistency across environments explained why his relatively good behavior at CLC contrasted so starkly with his behavior at home. Id at 10. The District maintained that while it hoped AK would eventually "be able to generalize his skills outside the school environment," it could not control AK's behavior outside the classroom and, therefore, "would not agree to making [AK's] IEP goals and objectives applicable across home and community settings." Id. Ms Hayes, a director at CLC, stated that CLC's expertise was in academic instruction and that it was not equipped to address all of AK's adaptive needs. Id; Doc # 78, TR of 7/30/03, Test of Kathleen Hayes ("TKH") at 56:28–57:3. The District, anticipating Ms Hayes' concerns, offered AK non-residential placement at the Tara Hills campus of the Spectrum Center, another private school specializing in the education of students with behavioral needs. Id; Doc # 61 at 14; SE 175. The District also offered a referral to Marin County Mental Health for an assessment. Doc # 61 at 14:20–21.

Although AK's parents visited Spectrum and met with the school's educational coordinator, they decided that a residential placement would better suit AK's needs. Doc # 61 at 15:1–2, 15:23–25. Accordingly, AK's parents removed him from CLC, rejected the District's offer to place AK at Spectrum and in March 2003, enrolled AK in a residential program at DGS. Doc # 61 at 16:5–10. Thereafter, the District initiated a due process hearing before the California Special Education Hearing Office. Id at 16:10–12. During the hearing, the District asserted that Spectrum constituted an offer of FAPE. Id; Doc # 1–1 at 11. AK's parents argued that residential placement at DGS was required. Doc # 1–1 at 11.

The hearing officer found for AK and determined that, in order to provide a FAPE for AK, the District was required to provide "a 24–hour–per–day residential placement" designed to "address [AK's] behaviors in the school environment" and enable AK "to generalize his behavior-related skills outside the school setting." Id at 31. The hearing officer based his decision on federal and state education law and determined that "the [d]istrict's contentions that it cannot control what occurs outside a school setting and therefore is not responsible for implementing goals and objectives outside the classroom and regular school hours are contrary to law." Id at 19.

Thereafter, the District filed this action for judicial review pursuant to 20 USC § 1415, and both parties filed motions for summary judgment. See Doc ## 54, 61.

III

A

The court first addresses the standard of review it must apply in an IDEA case. The standard of review for a district court in an IDEA case is less deferential than the standard applied in other administrative review cases. *Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993). The statute provides "the court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 USC § 1415(i)(2)(C).

While the district court must carefully consider the administrative agency's decision, after such consideration, the court is free to accept or reject the agency's findings. *Adams by & through Adams v. Oregon*, 195 F.3d 1141, 1145 (9th

Cir.1999) (citing *Gregory K,* 811 F.2d at 1311). A reviewing court, however, may not substitute its own notions of education policy for those of the agency it reviews. *Amanda J,* 267 F.3d at 887. Additionally, a court may increasingly defer to the findings of the hearing officer when "they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). Finally, when the court has before it all the evidence regarding the disputed issues, it may make a final judgment in what "is not a true summary judgment procedure [but] a bench trial based on a stipulated record." *Ojai,* 4 F.3d at 1472 n6.

## B

■ Although *Rowley* holds that a District must only provide "educational benefits" in order to provide a student with FAPE, that standard does not indicate what "educational benefits" the District must provide. While both parties agree that AK has extraordinary difficulty in generalizing behavioral skills learned in the classroom to the home and community settings, the hearing officer found and the evidence shows that his behavior at CLC was manageable enough that he made educational progress. The primary basis for the hearing officer's decision in AK's favor was the finding that one of AK's areas of educational need was the ability to generalize behavioral skills across settings. Doc # 1–1 at 20. The hearing officer found that, while the District's offer to place AK in Spectrum did not adequately address that particular need, AK's residential placement at DGS did. Doc # 61 at 24:12–19. AK contends that the generalization of behavioral skills into settings outside the classroom is an educational need that the District could appropriately address only through a residential placement. Doc # 61 at 21:21–24. The District argues that, as a matter of law, it is not responsible for ensuring that AK translates behav-

ior skills learned in the classroom to the home or community settings. Doc # 54:18–23. This court agrees with the District.

## 1

The IDEA requires school districts to provide special needs students with a "special education." 20 USC § 1400(d)(1)(A). "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings * * *" 20 USC § 1401(29). Thus "special education" in the context of the IDEA is defined by the highly individualized educational needs of the student. Yet this court remains unconvinced that the IDEA requires a school district to address behavior problems that occur outside of the school, when the student demonstrates educational progress in the classroom.

■ AK first argues that specific language in the IDEA recognizes generalization as an educational need that the District must address. Doc # 105 at 5:20–27. Primarily, AK argues that amendments to the IDEA in 1997 which establish that the purpose of the act is to prepare disabled individuals for "employment" and "independent living" require the District to address AK's behavior problems at home. Id. Yet AK cites to no authority which equates the IDEA's laudable goals to substantive standards. By contrast, the IDEA's definition of "individual education program" revolves around an individual's performance within the academic setting. For example, an IEP must state how the child's disability affects "involvement and progress in the general curriculum," set goals for maintaining that progress and meet the student's "other educational needs * * *" 20 USC § 1414(d)(1)(A)(i)

and (ii); see also 34 CFR § 300.320. The point that AK misses is that participation in the educational process, under the IDEA, is the vehicle for assisting individuals in achieving the goal of independence— it is not a guarantee that all children will achieve that level of independence. See HR Report No 105–95 at 85 ("Through this legislation the Committee intends to encourage exemplary practices that lead to improved teaching and learning experiences * * * that in turn * * * result in productive independent adult lives, including employment.") This point is further underscored by Congress' explicit preference for so called "mainstreaming," i e, maximizing a special needs student's participation in the "normal" classroom. See 20 USC § 1412(a)(5).

Notwithstanding this congressional intent, AK argues that the Ninth Circuit's decision in *County of San Diego v. California Special Education Hearing Office*, 93 F.3d 1458 (9th Cir.1996), supports the proposition that behavior and emotional problems that occur outside the home are properly addressed through an IEP. See Doc # 105 (AK's Reply) at 7:12–14. Yet *County of San Diego* actually held that behavioral and emotional goals are properly addressed through an IEP when they "*affect* academic progress, school behavior[ ] and socialization." 93 F.3d at 1467 (emphasis added). Additionally, the court specifically held that the appropriateness of an IEP is determined by "whether the child makes progress toward the goals set forth in [his or] her IEP." *Id.* The court went on to find that a day treatment program provided no educational benefit with respect to a student's behavioral IEP goals because the program had little effect on helping the student "control her anger, reduce her tendency to truancy, or diminish her frustration over academic work." *Id.* at 1467. Thus, behavioral and emotional goals are properly addressed through an IEP only to the extent that those problems affect the student's educational progress. See also *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1497, (9th Cir.1996) (residential placement proper where student's behavior and emotional problems "seriously affected her ability to benefit from classroom instruction" and ultimately caused her to be expelled from school); *Ojai*, 4 F.3d 1467, 1475–76 (9th Cir.1993) (residential placement appropriate where deaf and blind student, after 7 years in the public school system, had no communication skills, was not toilet trained, could not dress himself and had made no progress on his IEP goals). In sum, *County of San Diego* does not require a school district to address all of the emotional or behavioral problems a student may have, regardless of where and when those problems manifest.

Furthermore, AK cites to no authority holding that a school district must address a student's inability to generalize across settings in order to provide an educational benefit. AK relies only on testimony that AK has difficulty generalizing behavioral skills across settings. While that fact is not in dispute, not every need of a particular child is the legal responsibility of the District. Although the Ninth Circuit has not addressed the specific legal question, the 11th Circuit has held squarely that "generalization across settings is not required to show an educational benefit" and that anything "more than making measurable and adequate gains in the classroom, [is] not required by IDEA or *Rowley*." *Devine v. Indian River County School Bd.*, 249 F.3d 1289, 1292–93 (11th Cir.2001). Although the 11th Circuit does not provide detailed analysis on this issue, the rule makes sense in the context of the IDEA and the previously discussed Ninth Circuit precedent.

AK attempts to use California special education law to support the proposition

that generalization across settings is an educational need that the District must address. Doc # 86 (AK's Opp to Dist MSJ) at 8:9–20. Specifically, AK argues that because state law provides for a "behavior intervention plan" ("BIP") to address behavior across multiple settings, generalization is an educational need properly addressed here. Id at 9:2–4. But this court fails to see how the state requirement supports AK's contention. According to 5 CCR § 3001(f), a BIP is "a written document which is developed when the individual exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the individual's IEP." This regulation is consistent with the court's conclusion that a District is required to address behavioral problems extraneous to the academic setting only to the extent they affect the educational progress of the student.

2

 Finally, this court must determine whether the District's offer to place AK at Spectrum met the requirements of the IDEA. As discussed above, the District need not show that the placement at Spectrum was "potential maximizing," only that it was "reasonably calculated to provide educational benefits." Furthermore, the District is required to address AK's behavior only to the extent that it affects his educational progress.

The hearing officer found that the District's offer to place AK at Spectrum was not "reasonably calculated to provide educational benefits" because it did not provide a structured environment for AK twenty-four hours a day, seven days a week. Doc # 1–1 at 27. Specifically, the hearing officer found that because AK already had intensive behavioral support in his home for as much as 30 hours per week, Spectrum, as a day program, would not provide the "repetitive learning across all environments" that AK needs in order

to "generalize skills across settings." Doc # 1–1 at 26. As such, the hearing officer found that moving AK from CLC to Spectrum was essentially a "lateral move" that provided no benefit with respect to generalization beyond what CLC already provided. Id. Because the hearing officer premised this analysis on the erroneous legal conclusion that the IDEA requires the District to address behavior outside the home, regardless of educational progress, this court chooses not to defer to that finding.

First, this court finds that AK's educational progress at CLC, while not perfect, was substantial, notwithstanding his behavioral difficulties. In August 2002, the Golden Gate Regional Center ("GGRC"), in a review of AK's educational status, found that AK had "benefitted from [CLC]" and "reads up to grade level." Doc # 55 (Decl of Levine) Ex 2 at 5. Additionally, GGRC found that AK's behavior was controlled in the structured environment of CLC and that the programming at CLC was appropriate. Id at 4. During this period, there was only one event of significant aggression at CLC where AK had to be physically restrained. Doc # 61 at 9:24–26. Furthermore, as the testimony from several witnesses demonstrates, and as AK admits, his primary behavior problems at CLC were in the form of noncompliance and decreased responsiveness to reinforcement. Id at 9:23–28; Doc # 71, ex 1 at D00016; Doc # 77, TET at 125:11–15.

To address his behavior problems, towards the end of October, CLC reduced demands on AK and increased reinforcement measures. Doc # 82, TET at 125:18–24. Slowly, AK started to improve. Id. Indeed, AK's teacher at CLC in the Fall of 2002 testified that she wrote a report for AK's January 2003 IEP which showed that, by then, AK met or exceeded

9 out of 12 IEP goals set in 2002. Doc #82, TET at 149:7–9; Doc #71 at D00241–42. Of the three goals AK did not achieve, one he missed by 2% and one by 4%. See Doc #82 TET at 149:7–9; Doc #71 at D000241–42. The 2003 IEP indicates that with respect to his reading goals, AK was to be promoted from the third to the fourth grade. Doc #71, DE 1 at D0002. Accordingly, the court finds that, despite some behavior problems, AK had made significant educational progress at CLC going into his January 2003 IEP review.

Based on AK's increasing behavior problems at home and AK's isolated incidents of aggression at CLC and TASC, AK's parents' requested an immediate IEP in December 2002. Doc #61 at 10:28–11:5. CLC itself did not contact the District with concerns about AK's progress, and it was not until the February 2003 IEP that a CLC director voiced her concerns over the appropriateness of the CLC program for AK. Doc #78, TR of 7/30/03, Test of Kathleen Hayes ("TKH") at 66:19–24. The District responded to those concerns by offering to place AK at Spectrum, a private school for behaviorally and educationally challenged students. Doc #61 at 14:17–22. The placement included an offer to maintain AK's speech and language therapy at 2 hours per week, to provide 2 hours per week of occupational therapy and to provide transportation to and from Spectrum. Doc #82, Test of Sharon Pincus ("TSP") at 75:19; Doc #80, TSP at 5:1–5. The District also offered a referral to County Mental Health to determine whether AK was emotionally disturbed. Id at 5:7–9. In February, the IEP updated AK's IEP goals by including a functional living skills component that included instruction on daily living skills and community outings. Id at 7:13–26.

This court is persuaded that such a placement was "reasonably calculated to provide educational benefits" to AK. The testimony of Angela Zamora–Castillo, assistant director for Spectrum, confirmed that 60% of Spectrum's students are autistic and that the program is geared primarily towards educating emotionally disturbed students, most of whom have verbal or physical aggression problems and other disruptive behaviors, including noncompliance issues. Doc #81, TR of 7/25/03, Test of Angela Zamora–Castillo ("TAC") at 12:27–13:1, 9:5–13:24, 10:22–11:2, 11:14–22. Ms Castillo testified that Spectrum maintains a focus on the behavioral skills of its students through applied behavioral analysis and that teaching procedures at Spectrum include high levels of reinforcement. Id at 9:18–25, 10:7–8. Ms Castillo also testified that Spectrum provides education on adaptive skills such as getting dressed, hygiene and public safety and that Spectrum takes its students into the community where they can work on appropriate language and social skills outside of the classroom. Id at 17:24–18:10, 16:19–17:1. Dr Daley, a professor of special education at California State University Sacramento, testified that the Spectrum placement was an appropriate placement for AK and would meet his IEP objectives. Doc #81, Test of Dr Stephen Daley ("TSD") at 56:23–4, 62:23. Dr Daley also testified that it was appropriate for AK to be referred to County Mental Health to determine whether he was emotionally disturbed. Id at 81:13–17.

Accordingly, the District's offer to place AK at Spectrum was an appropriate response to the behavioral problems he exhibited in the Fall of 2002. AK's only argument to the contrary is that without structure and reinforcement 24 hours a day, 7 days a week he "will not generalize skills learned in one setting to other settings * * *." Doc #61 at 24:16–19; see also Doc #86 at 7:12–14. As previously

discussed, the District is not required to ensure that a student takes behavioral skills learned at school into the home. The District is only required to ensure that a student's IEP is "reasonably calculated to provide educational benefits." The District did so in this case.

## IV

For reasons discussed above, the District's motion for summary judgment is GRANTED, and AK's motion for summary judgment is DENIED. AK is not entitled to reimbursement from the District for the cost of his placement at DGS or any costs associated with that placement.

Because the court grants the District's motion, AK's request for fees and costs, Doc # 61, and the District's evidentiary objections, Doc # 107, are both moot and DENIED. Furthermore, because the court grants the District's motion, the court need not address whether, under *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), the hearing officer incorrectly placed the burden of proof on the District.

The clerk is DIRECTED to close the file and TERMINATE all motions.

SO ORDERED.