FILED
United States Court of Appeals
Tenth Circuit

August 29, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

THOMPSON R2-J SCHOOL
DISTRICT,

      Plaintiff - Appellant,

v.

LUKE P., by and through his parents
and next friends, JEFF and JULIE P.,

      Defendants - Appellees.

-----------------------------------------------

NATIONAL SCHOOL BOARDS
ASSOCIATION; COLORADO
ASSOCIATION OF SCHOOL
BOARDS; COLORADO BOCES
ASSOCIATION; COLORADO
BOARDS OF COOPERATIVE
EDUCATIONAL SERVICES
ASSOCIATION; COLORADO
SPECIAL EDUCATION DIRECTORS
CONSORTIUM; AUTISM SPEAKS,

      Amici Curiae.

No. 07-1304

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 05-cv-2248-WDM-CBS)

W. Stuart Stuller (Alyssa C. Burghardt with him on the briefs), of Caplan and
Earnest LLC, Boulder, Colorado, for Plaintiff-Appellant.

Jack D. Robinson of Spies, Powers & Robinson, P.C., Denver, Colorado, for Defendants-Appellees.

Kathleen Sullivan, Colorado Association of School Boards, Francisco M. Negrón, Jr., National School Boards Association, Alexandria, Virginia, and Darryl Farrington, Semple, Miller, Mooney & Farrington, P.C., Denver, Colorado, filed an amici curiae brief in support of Plaintiff-Appellant.

Gary S. Mayerson, Director, Autism Speaks, Federal Legal Appeals Project, Mayerson & Associates, New York, New York, filed an amicus curiae brief in support of Defendants-Appellees.

---

Before **BRISCOE, GORSUCH,** Circuit Judges, and **PARKER**, Senior District Judge.[*]

---

**GORSUCH**, Circuit Judge.

---

Jeff and Julie P. contend that the Thompson R2-J School District failed to provide their autistic son Luke with the educational services guaranteed to him by the Individuals with Disabilities Education Act ("IDEA") because of the difficulty he experiences in generalizing skills learned in the school setting to the home and other environments. They also assert that, given the severity of some of the manifestations of Luke's disability, only a private residential school can provide Luke with an adequate education. Having withdrawn Luke from the public school he attended in order to enroll him in a private residential program, the family now

---

[*] The Honorable James A. Parker, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation.

- 2 -

seeks reimbursement of Luke's tuition costs from the school district.  Because every factfinder to have assessed this case has found that Luke was making progress in the public school environment on the educational goals individually formulated for him by the school district and his parents, we are constrained to reverse.

I

A

Born in 1994, Luke was diagnosed with autism at the age of two.[1]  When he entered kindergarten at Niwot Elementary School in Colorado's St. Vrain Valley School District in the Fall of 2000, Luke began receiving special educational services from that school district in accordance with the provisions of IDEA.  *See* 20 U.S.C. § 1400 *et seq.*  IDEA is a federal statute aimed at helping states provide disabled children with a free and appropriate public education ("FAPE").  Central to IDEA is the requirement that local school districts develop, implement, and annually revise an individualized education program ("IEP") calculated to meet the eligible student's specific educational needs.  *See id.* § 1414(d).  In addition, IDEA specifies that disabled children should be educated in the "least restrictive environment," meaning that, "[t]o the maximum extent appropriate," disabled

---

[1]  As did the district court, we omit Luke's surname in deference to the family's privacy.

children should be educated in public school classrooms alongside children who are not disabled. *Id.* § 1412(a)(5)(A).

In accordance with these requirements, Luke's special education teacher at Niwot Elementary, Margaret Wilson, led the effort in formulating an IEP for Luke and working with him through his kindergarten and first grade years. Luke's IEPs for kindergarten and first grade included objectives relating to communication skills, self care (including toilet training), independence and motor skills, social interaction and play skills, and academic functioning. They also specified that Luke would split time between the general classroom and a special education classroom.

Ms. Wilson's evaluations indicate that Luke made significant progress and achieved many of his IEP goals during the time she worked with him, *see* Impartial Hearing Officer's ("IHO") Decision at 4-5; Administrative Law Judge's ("ALJ") Decision at 4, though she also reported that Luke, like many other autistic children, had difficulty generalizing skills, or, in other words, "apply[ing] the skill[s] to different people or different environments," Answer Br. at 42; *see* IHO Decision at 4. Luke's difficulty in generalizing the skills he learned in school to the home is borne out by discrepancies revealed in an adaptive behavior skills test that was administered to Luke both in the classroom and in his home. *See* IHO Decision at 4.

In the Fall of 2002, Luke's family moved to Colorado's Thompson R2-J School District, and Luke enrolled in second grade at Berthoud Elementary. In anticipation of the transfer, the special education teacher at Berthoud visited Niwot and communicated with Ms. Wilson, as well as Luke's parents, in order to make plans for a smooth transition. A new IEP was adapted from the IEPs that had been developed at Niwot, and Luke continued to make progress on his goals and objectives during his second grade year.

Despite the apparent progress at school during his kindergarten through second grade years, Luke's life away from school during the same time paints a much different picture, as his autism manifested itself in various behavioral problems that were especially severe at home. Luke was unevenly tempered, often displaying inappropriate and sometimes violent behavior at home and in public places such as grocery stores and restaurants. He developed various sleep problems – going to bed at odd hours, waking up frequently at night, and refusing to sleep in a bed. Luke also developed a habit of intentionally spreading his nighttime bowel movements around his bedroom. In addition, although Luke became toilet trained at school by the time he was in first grade, he was not able to transfer this skill to the home and other settings away from school.

Understandably, these behaviors took a tremendous toll on Luke's family. Worried that, without intervention, Luke's behavior would become only more dangerous as he continued to grow physically, the family began looking into

residential placement options. Through research on the Internet, they discovered the Boston Higashi School ("BHS"), which specializes in education of children with autism. Students enrolled in the residential program at BHS live at the Boston campus for 44 weeks out of the year and are supervised 24 hours a day by BHS educators and staff. ALJ Decision at 7. Luke's family, along with Ms. Wilson, who kept in touch with the family and retained an interest in Luke's education, visited the BHS campus in late Fall 2003 and filled out an application for Luke's admission during the visit.

At around the same time, Luke's family asked Diane Osaki, an occupational therapist who runs a private day school for autistic children, as well as Ms. Wilson, to observe and assess Luke while at school. Ms. Osaki observed Luke at Berthoud Elementary for a three hour period, interviewed Luke's parents, and reviewed charts and video footage of Luke. She reported a number of concerns in the school's work with Luke, including the facts that staff sometimes unknowingly reinforced Luke's unwanted behaviors, that Luke had made little or no progress on many of his goals and objectives, and that Luke had "[g]reat difficulty generalizing skills taught in one environment to natural daily living routines." Osaki Report, R. Vol. V. at 864. Ms. Osaki also expressed concern that Luke had "increase[d] the strength and number of challenging and unwanted behavior[s]" and that, since transferring to Berthoud Elementary, Luke had apparently regressed in certain respects. *Id.* Ms. Osaki did, however, note many

areas in which Luke was improving and stated that "throughout his early education, Luke has made good progress in all areas of development." *Id.* Ms. Osaki recommended, among other things, "12 month programming to reduce the risk of regression," increased consistency in training of school staff, and additional parent training. *Id.* at 866. For her part, Ms. Wilson met with Luke and administered the Autism Diagnostic Observation Schedule test. She reported to Luke's parents that some skills that Luke had previously mastered during his time working with Ms. Wilson at Niwot Elementary were diminished or were no longer present. *See* Wilson Letter, Dec. 11, 2003, R. Vol. V. at 858.

On December 16, 2003, Luke's parents met with his teachers and other school officials for an IEP review meeting. At the meeting, the parents presented a list of goals they had developed based on recommendations from Ms. Osaki and asked that the goals be included in Luke's IEP for 2004. They also stated, however, that they felt the goals were not attainable at Berthoud Elementary and that the only appropriate placement for Luke would be a residential program tailored to autistic children, such as that offered by BHS. The school district officials expressed openness to revising Luke's IEP to include the parents' proposed goals and to working with Ms. Osaki to improve their special education program. But they also expressed their belief that the proposed goals were attainable at Berthoud Elementary and that residential placement was not

necessary. At the meeting's conclusion, the school district officials stated that they planned to revise Luke's IEP and then submit a new draft to the parents.

Two days after the IEP meeting, on December 18, BHS accepted Luke's application for enrollment. The next day, on December 19, counsel for Luke's family sent the school district a letter stating that the family intended to remove Luke from Berthoud Elementary, enroll him at BHS, and, pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii), seek from the school district reimbursement of the costs of Luke's education at BHS. Luke officially enrolled as a residential student at BHS on January 12, 2004.

On January 15, 2004, the school district sent to Luke's family a revised, final IEP for 2004. The IEP proposed by the school district incorporated virtually all of the goals requested by the parents, but it called for continued placement at Berthoud Elementary rather than the residential placement requested by the parents. Luke's family rejected the IEP, and Luke remained enrolled at BHS.

B

In due course, the family sought an IDEA due process hearing in the Colorado Department of Education, pursuant to 20 U.S.C. § 1415, petitioning for a determination that the school district's IEP failed to provide Luke with a FAPE; that a residential placement was necessary for Luke; and that the school district should reimburse the family for Luke's education expenses at BHS. Following a five-day hearing, the impartial hearing officer ("IHO") held in favor of the

- 8 -

family, finding that, while the "evidence in general . . . suggest[s] that [Luke] made some progress in public school prior to [his removal], due to his inability to generalize his learning experiences at school to home and community environments, [Luke] was not able to apply this progress in those other contexts." IHO Decision at 14. On this basis, the IHO held that a residential placement was necessary for Luke and that the school district was obliged under IDEA to pay the costs of that placement.

On appeal before the Colorado Office of Administrative Courts, an Administrative Law Judge ("ALJ") agreed with the IHO that, although Luke "had achieved nearly a quarter of the goals and objectives in his IEP[,] . . . was making slow [but] steady progress toward others[,] . . . . [and] overall . . . was advancing in his goals at school[,] [t]he problem remained . . . [that Luke] was unable to transfer any of his learned skills and use them in environments outside of school." ALJ Decision at 8.

In response to these adverse decisions, the school district brought suit in federal district court, seeking review and reversal of the ALJ's and IHO's judgments. The district court, however, ultimately agreed with the administrative decisions that Luke's generalization deficiency warranted his placement in a residential program, and that the school district must reimburse the family for the residential placement costs at BHS. The school district now appeals.

II

Pursuant to Congress's direction, to obtain reimbursement for private tuition at BHS Luke's parents must show, at a minimum, that the school district violated IDEA and that the education provided by BHS is reasonably calculated to enable Luke to receive educational benefits. *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 978 (10th Cir. 2004); 20 U.S.C. § 1412(a)(10)(C)(ii). In turn, our precedent indicates that Luke's parents can show a violation of IDEA in one of two ways. They can either show that the school district failed to provide Luke with a free and appropriate public education; or they can show that, despite the school district's provision of a free and appropriate public education, it failed to provide that education, to the maximum extent appropriate, in the least restrictive environment.[2] *Nebo*, 379 F.3d at 975 n.13; 20 U.S.C. § 1412(a)(5).

Beginning with their initial request for a due process hearing before an IHO, Luke's parents have confined themselves to alleging the first type of violation – contending that the school district failed "to provide Luke [P.] with a

---

[2] The school district contends that Luke's parents must also show that BHS is the least restrictive environment in which Luke can receive educational benefits, citing to us *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 536-37 (3d Cir. 1995); *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 86 (D.C. Cir. 1991); *DeLullo v. Jefferson County Bd. of Educ.*, 71 F. Supp. 2d 554, 559 (N.D. W.Va. 1998). *But see Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 770 (6th Cir. 2001). We have no need to pass on this argument, however, because the parents' claim in this case falters on the antecedent question whether the school district violated IDEA.

free and appropriate public education." R. Vol. II at 240.[3]  The burden of proof in such a challenge rests with the party claiming a deficiency in the school district's efforts, here Luke's parents.  *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Johnson v. Indep. Sch. Dist. No. 4 of Bixby*,  921 F.2d 1022, 1026 (10th Cir. 1990).  In what follows, we first outline the contours of what a FAPE requires and then assess the two arguments Luke's parents advance for finding that the school district in this case failed to provide one.

A

How do we know when a school district has or has not provided a disabled student with a FAPE?  To be sure, the term is hardly self-defining.  Fortunately, however, the statute and Supreme Court afford some additional direction, indicating that we must ask, more specifically, whether Luke's December 2003 IEP was "reasonably calculated to enable [him] to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *see also Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008).  If the IEP was

---

[3] In a single sentence in their brief on appeal, Luke's parents might possibly be understood to argue that, even if the school district provided Luke a FAPE, it did not do so in the least restrictive environment.  Answer Br. at 54. Under our controlling precedent, this suggestion, "appearing only in a fleeting sentence" in an appellate brief, is too inadequately developed to be meaningfully addressed and is deemed waived.  *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008).

so calculated, the school district can be said to have provided a FAPE; if not, then not.[4]

The Supreme Court has further explained that this standard is not an onerous one. "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make . . . access meaningful. . . . [T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192.[5] So, for example, the Court found no support in the text or history of the Act for the proposition that Congress sought to guarantee educational services sufficient to "maximize each child's potential." *Id.* at 198. Instead, we are told, Congress sought only to require a "'basic floor of opportunity,'" *id.* at 200, aimed at providing individualized services sufficient to provide every eligible child with "*some* educational benefit," *id.* (emphasis added). We are also reminded that the "primary

---

[4] We generally also must inquire whether the school district has complied with the procedural requirements of IDEA. *See Rowley*, 458 U.S. at 206-07. Here, however, that question is not at issue before us because Luke's family does not dispute the propriety of the process used by the school district in formulating Luke's December 2003 IEP.

[5] *Rowley* involved an analysis of IDEA's statutory precursor, the Education of the Handicapped Act, but the same textual language has survived to today's version of IDEA. *Compare Rowley*, 458 U.S. at 187-89 (quoting EHA definitions) *with* 20 U.S.C. § 1401(9), (26), (29) (current IDEA definitions). Indeed, the Supreme Court has recently cited approvingly *Rowley*'s discussion of the meaning of FAPE in *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 127 S. Ct. 1994, 2000-01 (2007).

responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207. From this direction, we have concluded that the educational benefit mandated by IDEA must merely be "more than *de minimis.*" *Urban ex rel. Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996). Finally, because the question before us is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so, our precedent instructs that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student . . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701-02 (10th Cir. 1998).

In assessing whether Luke's parents have carried their burden of establishing that his December 2003 IEP fails to meet these standards, we apply a somewhat unique standard of review. "Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context." *Garcia*, 520 F.3d at 1125; 20 U.S.C. § 1415(i)(2)(C). Specifically, the district court must (1) receive the record of the

administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C). "At the same time, though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings, the fact findings of which are 'considered prima facie correct.'" *Garcia*, 520 F.3d at 1125. We apply these very same principles in our own review of the district court's judgment. *Id.* "Thus, we actually apply a modified *de novo* review, which entails an independent review of the evidence." *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1093 (10th Cir. 2001); *Nebo*, 379 F.3d at 974 ("[T]he district court conducted a bench trial on the administrative record which this court reviews *de novo*, applying the same IDEA standard that was employed by the district court.").[6]

---

[6] Although Luke's parents urge us to review the district court's factual findings for clear error, citing *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997), this court has already rejected application of the clear error standard and, of course, one panel of this court cannot overrule the decision of a prior panel. *Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1120 n.6 (10th Cir. 1999). We recognize, though, that, while we are bound to apply a modified *de novo* standard of review, our rule represents the distinct minority position among circuit courts, *see, e.g.*, *Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1229 (8th Cir. 1994); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir. 1993); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). Our modified *de novo* approach also runs counter to the general standard of review suggested in Fed. R. Civ. P. 52(a). *En banc* reconsideration of our standard of review may well be appropriate at some point. In this case, however, the standard of review is not dispositive. As discussed below, *see* Part II.B.2, the

(continued...)

B

Luke's parents contend that his December 2003 IEP was not reasonably calculated to provide him with educational benefits primarily because it failed to address adequately his inability to generalize functional behavior learned at school to the home and other environments. The ability to generalize, Luke's parents insist, is "fundamental," Answer Br. at 43, and without it "learning does not exist," *id*. at 42. Absent the ability to generalize skills learned at school, particularly basic self help and social skills, they submit Luke's education is effectively worthless. And the only setting in which Luke is certain to improve his generalization skills, his parents maintain, is a residential setting not provided for in the challenged IEP. The school district responds that, as a matter of law, generalization across settings is not required by IDEA so long as Luke can be said to be making *some* progress in school, and cites cases from the Eleventh and First Circuits, as well as various district courts, so holding.[7] We are constrained to

---

[6](...continued)
tribunals that have previously considered this case all found that Luke was making some progress, and so whether we apply a modified *de novo* review or afford greater deference to findings of prior factfinders, the outcome would be the same. Our disagreement with the district court that ably and carefully considered this matter is limited solely to the legal question what consequences follow under IDEA's terms from its factual findings.

[7] *See Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289 (11th Cir. 2001); *Gonzalez v. Puerto Rico Dept. of Educ.*, 254 F.3d 350 (1st Cir. 2001); *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563 (11th Cir. 1991); *San Rafael Elementary Sch. Dist. v. Cal. Special Educ. Hearing Office*, 482 F. Supp. 2d 1152
(continued...)

- 15 -

agree with the school district and our sister courts.  Though one can well argue that generalization is a critical skill for self-sufficiency and independence, we cannot agree with appellees that IDEA always attaches essential importance to it.

1

In support of their argument about the essential legal importance of generalization skills, appellees point to and rely heavily on language in the Act's statements of purpose indicating that Congress sought to help prepare disabled students for self-sufficient "independent living."  *See* 20 U.S.C. § 1401(34); 20 U.S.C. § 1400(c)(1) (referring to "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency").  Luke's parents submit that without an assurance that students will be able to generalize skills from the school environment to the home – whether learning how to sit quietly, following directions, or otherwise – the sort of self-sufficiency and independence Congress expressly wished for disabled persons like their son will always be beyond reach.

While we are sympathetic to Luke's parents' desire to see their child thrive, the difficulty with their argument is that Congress did not provide in IDEA a guarantee of self-sufficiency for all disabled persons, and the most authoritative arbiter of congressional intent has already reached this conclusion.  In *Rowley*, the

_____

[7](...continued)
(N.D. Cal. 2007), *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457 (D.N.J. 1997); *Hall v. Shawnee Mission Sch. Dist.*, 856 F. Supp. 1521 (D. Kan. 1994).

Supreme Court expressly considered and rejected the notion that "self-sufficiency" is "the substantive standard which Congress imposed on the States." 458 U.S. at 201 n.23. The Court explained that "[n]oticeably absent from the language of [IDEA] is *any* substantive standard prescribing the level of education to be accorded handicapped children." *Id*. at 189 (emphasis added). Rather, while the promotion of self-sufficiency was surely among Congress's purposes in enacting IDEA, the Court explained that Congress proceeded to select a rather particular means for advancing that purpose – a statutory scheme focused on and limited to enhancing disabled students' access to public education. *See id*. at 192; *id.* at 201 n.23 ("We thus view these references in the legislative history [to the concept of self-sufficiency] as evidence of Congress's intention that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap.").

Specifically, Congress mandated that the States provide "individual education programs" for all eligible disabled students, but then left the content of those programs entirely to local educators and parents, requiring only that they include "a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum" and meet the child's "other educational needs." 20 U.S.C. § 1414(d)(1)(A)(i)(II). In other words, Congress established procedures to

guarantee disabled students access and opportunity, not substantive outcomes. *See Rowley*, 458 U.S. at 192; *see also* Dixie Snow Huefner, *Judicial Review of the Special Educational Program Requirements Under the Education for All Handicapped Children Act: Where Have We Been and Where Should We Be Going?*, 14 Harv. J. L. & Pub. Pol'y 483, 495 (1991) (discussing how IEPs do not guarantee particular outcomes because "[i]f the IEP were a contract obligating the school to achieve the specified goals and objectives, districts would set the most minimal of goals"). Congress further prescribed that IEPs should generally be addressed to and carried out in the least restrictive environment available – usually the public school classroom. 20 U.S.C. § 1412(a)(5)(A). And while not mandating what their content should be, Congress emphasized the need for a careful and open process in the creation of IEPs: "We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206. So, as the court in *San Rafael* aptly explained, "participation in the education process under the IDEA[] is the vehicle [Congress chose] for assisting individuals in achieving the goal of independence – [the Act] is not a guarantee that all children will achieve that level of independence." 482 F. Supp. 2d at 1161. To the extent that a child's problems pertain only outside

the educational realm, then, "other resources [not IDEA] must be looked to." *Gonzalez*, 254 F.3d at 353 (internal citation omitted).

Our reading of the Act on this score is in harmony with the holdings of other circuits who have reached this question before us. In *Gonzalez*, a family claimed, much as here, that while their autistic son, Gabriel, might have been making modest academic progress at school, placement in a private residential program was necessary because he was not generalizing skills learned at school and his tantrums at home made him a potential safety threat. Without discounting the struggles Gabriel's parents faced, the First Circuit held that IDEA was not designed "to remedy a poor home setting or to make up for some other deficit not covered by the Act." *Gonzalez*, 254 F.3d at 353 (internal citation omitted). Similarly in *Devine*, the Eleventh Circuit rejected private placement for an autistic student, holding that "generalization across settings is not required to show an educational benefit," and that school districts must do no more than provide an IEP that enables the student to "mak[e] measurable and adequate gains in the classroom." 249 F.3d at 1293. *See also L.G. ex rel. B.G. v. Sch. Bd. of Palm Beach County*, 255 F. App'x 360, 365-67 (11th Cir. 2007) (denying claim by parents for reimbursement of residential placement costs where child was making progress in classroom but not generalizing the progress outside of school); *San Rafael*, 482 F. Supp. 2d 1152, *D.B.*, 985 F. Supp. 457; *Hall*, 856 F. Supp. 1521; Terry Jean Seligmann, Rowley *Comes Home to Roost: Judicial*

*Review of Autism Special Education Disputes*, 9 U.C. Davis J. Juv. L & Pol'y 217 (2005) (discussing rise of autism rates and IDEA cases); *see* Brief of *Amici Curiae* Colorado Association of School Boards et al. (arguing that self-sufficiency is not the substantive standard imposed by IDEA).

While we hold that generalization skills need not always be included in, and progress on such skills is not necessary to ensure, a compliant IEP, we remain mindful that the Supreme Court has cautioned against "establish[ing] any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Rowley*, 458 U.S. at 202. For this reason, we note that at least one other court has suggested that in some instances difficulty generalizing skills may be so severe that it prevents a student from receiving *any* educational benefit. *See Gonzalez*, 254 F.3d at 353. In such situations, our sister court held, an IEP "must address such problems in some fashion, even if they do not warrant residential placement." *Id*. As discussed below, however, because the student before us was indisputably making *some* progress, we need not reach this question today.[8]

---

[8] Luke's family cites to us a number of district and state court cases in which district courts held that residential placement was appropriate. But in each instance the student's generalization deficiencies or regression tendencies were so severe that they essentially prohibited *any* learning or progress on the student's IEP goals. *See Ash v. Lake Oswego Sch. Dist. No. 7J*, 766 F. Supp. 852 (D. Or. 1991); *S.C. ex rel. C.C. v. Deptford Twp. Bd. of Educ.*, 248 F. Supp. 2d 368, 376-80 (D.N.J. 2003); *Drew P. v. Clarke County Sch. Dist.*, 676 F. Supp. 1559, 1561 (M.D. Ga. 1987); *Cremeans v. Fairland Local Sch. Dist.*, 633 N.E.2d 570, 579-80

(continued...)

In this case, we simply cannot say that, as of December 2003, Luke's generalization difficulties precluded him from making some progress at Berthoud Elementary. Critically, every single factfinder in this case found that Luke was progressing on his existing IEP goals in public school. By way of example, the IHO determined that "the evidence in general and the December 16, 2003, IEP in particular suggest that Luke made some progress in public school prior to that date." IHO Decision at 14; *see also id.* at 6 ("[T]he succession of IEPs developed for [Luke] during his kindergarten through second grade years reveal no highly remarkable difficulties with his special education in public schools."); *id.* ("[A]t school . . . [Luke] seemed to make adequate progress."). The ALJ similarly found that "[d]uring kindergarten through his second grade year at Berthoud, [Luke] made progress with his special education and was meeting many of the goals and objectives in his IEPs." ALJ Decision at 4. Finally, the district court found that "a comparison of his third grade IEP and kindergarten IEP demonstrates that Luke progressed in several areas," Dist. Ct. Op. at 7, and held that the IHO's and ALJ's findings that "Luke made some progress on the goals contained in [his IEPs] . . . is supported by a preponderance of the evidence on the record." *Id.*[9]

---

[8](...continued)
(Ohio App. 1993).

[9] Although Luke's family contends that any factual findings indicating that
(continued...)

Such past progress is, of course, not dispositive of the controlling question whether, going forward, the December 2003 IEP was reasonably calculated to confer some educational benefit, but it does strongly suggest that, modeled on prior IEPs that had succeeded in generating some progress, the December 2003 IEP was reasonably calculated to continue that trend. Moreover, given IDEA's emphasis on the importance of the process by which IEPs are created, *see supra* Part II.B.1, the fact that the school district incorporated into the new IEP virtually every one of the substantive goals recommended by Luke's parents and their experts – many of which expressly relate to improving Luke's generalization skills – is telling.[10] This is not the usual IDEA dispute where the student and

---

[9](...continued)
Luke was making progress in school are clearly erroneous in light of alleged regression in some areas, these findings are well-supported by the record and we perceive no contrary facts to rebut the *prima facie* presumption of correctness that these findings are owed under our modified *de novo* review standard. After all, as the ALJ noted, Luke had "achieved nearly a quarter of the goals and objectives in his IEP and [] was making slow [but] steady progress toward others." ALJ Decision at 8. Moreover, the ALJ specifically determined that a report documenting the alleged regression upon which the family seeks to rely was "evidence of his inability to generalize, not necessarily conclusive proof that he had lost skills he had previously learned." *Id*. at 7. Even the family's own witness, Ms. Osaki, stated in her report to the family – just shortly before the family withdrew Luke from Berthoud Elementary – that "throughout his early education, Luke made good progress in all areas of development." Osaki Report, R., Vol. V. at 864.

[10] For example, the school district included as an objective that Luke "demonstrate understanding/use of size, spatial and quantity concepts" and that he be able to "generalize use of concepts to novel activities." R. Vol. IV, at 704. Similarly, the IEP called for Luke to "spontaneously indicate the need to use the
(continued...)

parents allege that their concerns have gone unheeded or unaddressed in the IEP process.[11]  Indeed, both the IHO and the ALJ found the December 2003 IEP to represent a "monumental and genuine effort on the part of the District to improve [Luke]'s performance in a number of areas affected by his autism."  ALJ Decision at 8; *see also* IHO Decision at 20.  Affording due weight to the findings of the IHO, ALJ, and district court that (i) Luke was making some educational progress, and (ii) his December 2003 IEP was generated in a manner that represented a monumental and genuine effort to continue such progress, we believe these findings compel, as a matter of law, the conclusion that the school district met its IDEA obligations in this case.

These tribunals reached a contrary judgment in this case only because, in their judgment, "whatever educational progress Luke made . . . was meaningless if there was no strategy to ensure that those skills would be transferred outside of

_____

[10](...continued)
bathroom once per day, with generalization to all environments."  *Id*. at 706.  The school district also included a comprehensive behavior support plan, designed to address many of the negative behaviors that Luke engaged in at school and at home.  *See id.* at 714-16.

[11]  To be sure, Luke has made significant strides at BHS, and BHS may well provide a superior education to the one available in the public school system.  But Congress simply did not guarantee children "a potential-maximizing education," *Rowley*, 458 U.S. at 197 n.21, and in evaluating Luke's IEP we are not entitled to give weight to his subsequent success in private school, *see O'Toole*, 144 F.3d at 701-02.

the school environment." D. Ct. Op. at 16.[12]  For reasons we have explained, however, this conclusion rests on a legal error.  No educational value or goal, including generalization, carries special weight under IDEA.  The fact that, by the admission of every factfinder in this case, Luke *was* making some educational progress and had an IEP reasonably calculated to ensure that progress continued is sufficient to indicate compliance, not defiance, of the Act.  In this respect, we think our case bears a certain resemblance to *Rowley*.  There, the Supreme Court confronted a challenge to a school district's decision to deny a deaf student a sign language interpreter.  Pursuant to her IEP, the student received the use of a hearing aid and some individualized instruction.  *Rowley*, 458 U.S. at 184.  In rejecting a claim by the student's parents that she was also entitled to a sign language interpreter, the Supreme Court did not question that an interpreter would be of great assistance, but explained that the student was making some progress without one, and that some progress was all the Act required.  *Id*. at 210.  The Court so held, moreover, over a dissent that – like the three prior tribunals in this case – would have found that "[t]he Act requires more" than simply that a student receive "some benefit."  *Id*. at 214-15.  The difficulties Luke faces in the classroom and at home are no doubt considerably greater in scope and severity

[12] *See also* ALJ Decision at 8 ("The problem remained . . . that despite his progress at school, [Luke] was unable to transfer any of his learned skills and use them in environments outside of school."); IHO Decision at 21 ("[Luke] will derive no benefit at all from attaining goals and objectives in school if he cannot replicate any of his accomplishments anywhere else.").

than those faced by the student in *Rowley*. But the legal principle outlined there by the Supreme Court controls equally here: a school district is not required to provide every service that would benefit a student if it has found a formula that can reasonably be expected to generate some progress on that student's IEP goals.

C

Even if progress on generalization skills is not an inescapable component of all IEPs under federal law, Luke's parents suggest, alternatively, that Colorado law guarantees such progress. And because "[s]tate standards that impose a greater duty to educate disabled children, if they are not inconsistent with federal standards, are enforceable in federal court under the IDEA," *Fowler v. Unified Sch. Dist. No. 259*, 128 F.3d 1431, 1438 (10th Cir. 1997) (internal quotation omitted); 20 U.S.C. § 1407 (requiring state regulations to conform to federal law, but allowing the possibility for state regulations not required by federal law), the family asks that we hold the school district to the purportedly higher standard required by Colorado law.

As it happens, however, the state regulations cited by Luke's parents simply specify that the "delivery system" by which the state provides special education services "shall include . . . those services which enhance cognitive, communicative, physical and social-emotional development and teach students the skills critical to compensate for their disability. . . . [and] those services which are necessary to teach students to function independently or interdependently in

current and future environments including school, home, employment and the community." 1 Colo. Code Regs. § 301-8, 2220-R-5.03(4) (2005). Far from giving any substantive definition to the sort of education that must be provided to every student on an individual basis, let alone guarantee generalization skills are addressed, these regulations merely specify some of the various services that special education programs should make available as a general matter. The very same regulation, in an earlier section, actually defines "appropriate education" in terms that very much reflect the statutory text of IDEA and comport with *Rowley*'s holding that the educational benefits conferred under IDEA are highly individualized rather than standardized in any substantive way. *See id.* § 5.01(2) ("'Appropriate' education shall be the provision of educational services that meet the individual needs of children with disabilities as identified on the individualized educational programs (IEPs)."). We thus discern no educational standard imposed by state law that would guarantee the generalization of skills for all children.[13]

\* \* \*

We sympathize with Luke's family and do not question the enormous burdens they face. Our job, however, is to apply the law as Congress has written

---

[13] It appears that shortly after this case was briefed the Colorado Department of Education enacted changes to the state regulations in question. Neither party, however, has filed any documents with the court attempting to claim the benefit of any change, and so we treat any such arguments as waived.

it and the Supreme Court has interpreted it. Though IDEA is certainly evidence that Congress intends that States, acting through local school districts, provide assistance to disabled students and their families, the assistance that IDEA mandates is limited in scope. The Act does not require that States do whatever is necessary to ensure that all students achieve a particular standardized level of ability and knowledge. Rather, it much more modestly calls for the creation of individualized programs reasonably calculated to enable the student to make some progress towards the goals within that program. The findings of every factfinder in this case indicate that this standard has been met here. For this reason, we are constrained to reverse the district court's judgment and remand for further proceedings not inconsistent with this opinion.