**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ALEX W., by and through his parents
and next friends, MARLENE W. and
WILLIAM W.,

Plaintiffs - Appellants/Cross-
Appellees,

v.

POUDRE SCHOOL DISTRICT R-1,

Defendants - Appellees/Cross-
Appellants.

Nos. 22-1236 & 22-1250

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 19-CV-01270-CMA-SKC)**
_____

Jack D. Robinson of Spies Powers & Robinson, P.C., Denver, Colorado for
Plaintiffs-Appellants/Cross-Appellees.

Robert P. Montgomery of Semple, Farrington, Everall & Case, P.C., Denver,
Colorado (Mary B. Gray and M. Brent Case, Semple, Farrington, Everall &
Case, P.C., with him on the briefs), for Defendant-Appellee/Cross-Appellants.
_____

Before **ROSSMAN, KELLY,** and **BRISCOE**, Circuit Judges.
_____

**ROSSMAN**, Circuit Judge.

The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, guarantees disabled students "a free appropriate public education," or a FAPE. 20 U.S.C. § 1400(d)(1)(A). Appellant Alex W. is a student with disabilities who attended elementary school from 2014 to 2018 in the Appellee Poudre School District R-1 (School District). In 2018, his parents filed a complaint with the Colorado Department of Education alleging the School District denied Alex a FAPE. The Parents also sought reimbursement from the School District for an independent neuropsychological evaluation conducted in the summer of 2018. An administrative law judge denied relief but ordered the School District to reimburse the Parents for the cost of the independent evaluation under 34 C.F.R. § 300.502(b)(2). The Parents challenged the ALJ's decision on the FAPE claims in federal district court. The School District brought a counterclaim, seeking reversal of the reimbursement order. The district court affirmed the ALJ's decision in full.

Exercising jurisdiction under 28 U.S.C. § 1291, we conclude the School District fulfilled its obligations under the IDEA, so we affirm in Appeal No. 22-1236. But reimbursement was ordered in error, so we reverse in Cross-Appeal No. 22-1250.

## I

We begin by describing the legal, factual, and procedural background common to both appeals. We then consider each appeal in turn, analyzing the issues raised by the parties and adding context as needed.

## A

Congress passed the IDEA to ensure "children with disabilities receive needed special education services." *Fry* v. *Napoleon Cmty. Schs.*, 580 U.S. 154, 157 (2017). The IDEA "requires States receiving federal funding to make a 'free appropriate public education' available to all children with disabilities residing in the State." *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 232 (2009) (quoting 20 U.S.C. § 1412(a)(1)(A)). A FAPE is considered a "basic floor of opportunity" to allow a child with disabilities access to an individually designed education. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty* v. *Rowley*, 458 U.S. 176, 201 (1982). At the "core" of the FAPE requirement is the "cooperative process . . . between parents and schools," *Schaffer ex rel. Schaffer* v. *Weast,* 546 U.S. 49, 53 (2005), to jointly craft an "'individualized education program,' or IEP" for each disabled student, *Endrew F. ex rel. Joseph F.* v. *Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting 20 U.S.C. § 1401(9)(D)).

An IEP is the "comprehensive plan" by which "special education and related services are 'tailored to the unique needs' of a particular child." *Endrew*

*F.*, 580 U.S. at 391 (quoting *Rowley*, 458 U.S. at 181). Each IEP is "prepared by a child's 'IEP Team[,]' []which includes teachers, school officials, and the child's parents." *Id.* An individualized education program "serves as the 'primary vehicle' for providing each child with the promised FAPE." *Fry*, 580 U.S. at 158 (quoting *Honig* v. *Doe,* 484 U.S. 305, 311 (1988)).

The IDEA requires school districts to conduct an "initial evaluation" when a student with a suspected disability is identified. 20 U.S.C. § 1414(a)(1). School districts also must conduct a "reevaluation" of disabled students at least once every three years. 20 U.S.C. §§ 1414(a)(2)(A)–(B).[1] The IDEA thus ensures schools will gather data that may assist in developing a child's individualized education program. 20 U.S.C. §§ 1414(b)(2)(A)(i)–(ii).

The IDEA also permits parents to seek an independent educational evaluation (IEE). 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502. An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i). "A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an

---

[1] The IDEA authorizes a parent to request a new evaluation each year. 20 U.S.C. §§ 1414(a)(2)(A)–(B) (stating a "local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation," 20 U.S.C. § 1414(a)(2)(A), but such a reevaluation shall not occur "more frequently than once a year, unless the parent and the local educational agency agree otherwise").

evaluation with which the parent disagrees." 34 C.F.R. § 300.502(b)(5). If a parent requests such a publicly-funded IEE, a school district "must, without unnecessary delay, either . . . [f]ile a due process complaint to request a hearing to show that its evaluation is appropriate," or "[e]nsure that an [IEE] is provided at public expense." 34 C.F.R. § 300.502(b)(2).

The IDEA establishes dispute resolution procedures to resolve disagreements between school districts and parents. 20 U.S.C. § 1415(e), (f)(1)(B)(i). "If these measures fail to produce accord, the parties may proceed to what the [IDEA] calls a 'due process hearing' before a state or local educational agency." *Endrew F.*, 580 U.S. at 391–92 (quoting 20 U.S.C. §§ 1415(f)(1)(A), (g)). At the conclusion of the administrative process, "any party aggrieved by the findings and decision" may seek redress in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

**B**[2]

Alex lives with several disabilities, including down syndrome, autism spectrum disorder, and substantial hearing and vision impairments. Vol. 2 at 515 ¶ 1. Alex was first diagnosed with autism at Children's Hospital Colorado

---

[2] We take these facts from the ALJ's decision. *Thompson R2-J Sch. Dist.* v. *Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (explaining, in the IDEA context, ALJ's factual findings are considered "prima facie correct" on appellate review). For additional background, we supplement with citations to the appellate record.

in 2011.[3] Because of his disabilities, Alex "exhibit[s] behaviors that affect his ability to be educated in typical school settings, such as grabbing, kicking, pulling hair, undressing himself, and attempting to run away." Vol. 2 at 515–516 ¶ 1. He engages in "perseverative, self-stimulating actions such as rocking, and frequently attempts to lick or place his mouth on objects he encounters." Vol. 2 at 516 ¶ 1. Alex is "substantially nonverbal;" he communicates using a NovaChat, a touch-screen tablet with icons. Vol. 2 at 516 ¶ 3. He also wears bone-anchored hearing aids.

In February 2014, the Parents enrolled Alex in the School District for first grade. The School District then performed an initial evaluation. The Parents and the School District agreed Alex would attend Werner Elementary School and participate in the Integrated Learning Supports (ILS) program.

---

[3] The Parents suggest the School District did not review the 2011 report but only reviewed a later report prepared by Children's Hospital in 2014. The Parents appear to argue the School District could not have evaluated Alex's autism-related needs without reviewing the 2011 report. The Parents correctly identify uncertainty in the record about whether the School District reviewed the 2011 report, but that does not affect our disposition or analysis.

There are some differences between the two reports. For example, the 2011 report describes assessments performed to diagnose Alex's autism and general recommendations for supporting children with autism. *See* Vol. 4 at 850–58. The 2014 report discusses Alex's autism diagnosis, while the recommendations focus more on Alex's speech-language and motor skills. Vol. 4 at 996–1001. But there is no question the School District knew Alex had been diagnosed with autism before he enrolled in 2014. Opening Br. at 9 n.5. And, as we explain, the School District provided services to address Alex's autism-related needs.

The ILS program "implemented aspects of Applied Behavior Analysis," a "research-based system of measures commonly used in educating students with ASD," or autism spectrum disorder. Vol. 2 at 516 ¶ 6.

Alex was supported by his IEP Team at Werner. The IEP Team included Alex's parents, his general education teacher, his special education teacher, and the School District's speech-language and occupational therapists. Alex's IEP Team met annually to discuss his progress and update his goals.[4]

In August 2017, the School District conducted a triennial reevaluation of Alex (the 2017 Reevaluation). The 2017 Reevaluation reassessed Alex's vision and hearing, general intelligence, cognitive and adaptive functioning, academic performance, and social and emotional abilities. Alex was observed in various school settings, and the School District also gathered information from Alex's parents and teachers. The 2017 Reevaluation acknowledged Alex continued to struggle with behavioral challenges and that his progress on the NovaChat had "plateaued." Vol. 3 at 649.

The results of the 2017 Reevaluation informed the development of Alex's 2017 IEP. As relevant here, the School District changed how Alex received speech-language and occupational therapy services. Alex would receive "fewer

---

[4] Alex's IEP Team developed individualized education programs for him for each academic year. As we explain, this appeal ultimately concerns Alex's IEPs for the 2016-2017 school year (the 2016 IEP) and the 2017-2018 school year (the 2017 IEP).

minutes of direct services per week" under the School District's new approach, but Alex's specialists and his instructors would consult more frequently on how to best assist him. Vol. 2 at 523–24 ¶ 37.

The Parents challenged the results of the 2017 Reevaluation. In particular, they disagreed with the conclusions concerning speech-language and occupational therapy, and in February 2018, requested an independent educational evaluation in those areas at public expense under 34 C.F.R. § 300.502(b). The School District funded the IEE and worked with the Parents to identify providers to perform it. Alex's IEP Team met in April 2018 to discuss the results of that independent evaluation. In the summer of 2018, the Parents continued to challenge the results of the 2017 Reevaluation and requested Alex undergo another publicly-funded IEE—this one in the area of neuropsychology. Vol. 2 at 535 ¶ 86. The School District refused, maintaining the Parents were not entitled to a second IEE at public expense to challenge the same school district evaluation. The Parents then paid $5,500 for the independent neuropsychological evaluation.

Between April and May 2018, the School District performed a functional behavioral analysis (FBA) at the Parents' request. An FBA is a tool used to "understand why/when/where behaviors are occurring and to learn how to reduce [their] number, frequency, and intensity." Vol. 2 at 517 ¶ 10. Depending on what the FBA reveals, a School District can develop a behavior intervention

plan (BIP) to help a student manage "maladaptive behavior." Vol. 2 at 517–18 ¶ 11. The Parents also requested an independent FBA, which the School District funded.

In September 2018, Alex withdrew from the School District.

## C

On July 10, 2018, the Parents filed a due process complaint with the Colorado Department of Education alleging Alex was denied a FAPE from 2014 to 2018. They claimed Alex did not make progress under his IEPs because the School District inadequately assessed and addressed Alex's behavioral issues, improperly reduced his speech-language and occupational therapy services, denied him extended school year services, and failed to evaluate all areas of Alex's disability. The Parents sought reimbursement for the independent neuropsychological evaluation the School District refused to fund in June 2018.

The School District moved for partial dismissal, contending the claims about the 2014 and 2015 academic years were barred under the IDEA's two-year statute of limitations. *See* 20 U.S.C. § 1415(b)(6)(B); 20 U.S.C. § 1415(f)(3)(C). The ALJ granted the motion. Vol. 6 at 1517:2–9.

The case proceeded as to the 2016 and 2017 school years. After a five-day evidentiary hearing, the ALJ concluded the School District had provided Alex

a FAPE. Vol. 2 at 545–46.[5] The ALJ also ordered the School District to reimburse the Parents for the cost of the independent neuropsychological evaluation. *Id.* According to the ALJ, the School District "should have undertaken its own neuropsychological assessment of [Alex] in 2017." *Id.* at 543. After the Parents requested the neuropsychological IEE in June 2018, the ALJ reasoned, the School District had two options under 34 C.F.R. § 300.502(b)(2): "comply with the request or file for due process without undue delay" to defend its evaluation. *Id.* at 543. The School District simply denied the request, so the ALJ found the Parents were entitled to reimbursement.

The Parents then sued the School District in federal district court in Colorado. The Parents reprised most of the arguments made to the ALJ. They did not challenge the ALJ's decision to dismiss on statute of limitations grounds their claims relating to the 2015 and 2016 school years. The School District counterclaimed, contending the ALJ erroneously ordered the School District to pay for the neuropsychological IEE. Vol. 1 at 29, 32. According to the School District, it "had already met its legal obligation to fund an IEE

---

[5] At the due process hearing, the ALJ heard testimony from nearly twenty witnesses. The Parents testified, along with other members of Alex's IEP Team, including his special education teacher, school psychologist, speech-language pathologist, and occupational therapist. The parties' experts also testified. For example, the ALJ heard from specialists who conducted Alex's independent educational evaluations and his independent functional behavioral analysis. A private behavioral specialist hired by the Parents also testified. The ALJ received thousands of pages of documentary evidence.

related to the 2017 evaluation, at public expense, as required by 34 C.F.R.
§ 300.502(b)(5)." Vol. 1 at 31 ¶ 22.

No party asked for a hearing or submitted additional evidence, and the
case was submitted for decision on the administrative record. The district court
affirmed the ALJ's decision in full and entered final judgment.

These timely appeals followed.

## II

We have a "somewhat unique standard of review" in IDEA cases.
*Thompson R2-J Sch. Dist.* v. *Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1149 (10th
Cir. 2008). "Unlike the deferential review typically afforded to administrative
adjudication of statutory claims, Congress requires district courts to apply a
modified *de novo* standard when reviewing agency disposition in the IDEA
context." *Id.* (quoting *Garcia* v. *Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d
1116, 1125 (10th Cir. 2008)); *see also* 20 U.S.C. § 1415(i)(2)(C). "Specifically,
the district court must (1) receive the record of the administrative proceedings,
(2) hear additional evidence at the request of a party, and (3) base its decision
on the preponderance of evidence." *Thompson*, 540 F.3d at 1149–50. "At the
same time, though the statute specifies that review is *de novo,* the Supreme
Court has interpreted the requirement that the district court receive the
administrative record to mean that due weight must be given to the
administrative proceedings, the fact findings of which are considered prima

facie correct." *Id.* at 1150 (quoting *Garcia,* 520 F.3d at 1125) (internal quotation marks omitted). And on appeal, "[w]e apply these very same principles in our own review of the district court's judgment." *Id.*[6] "We review any legal conclusions, however, under our usual de novo standard." *O'Toole ex rel. O'Toole* v. *Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998).

With these principles in mind, we turn first to the Parents' appeal.

## A

We begin by briefly describing the Parents' appellate contentions concerning the applicability of the IDEA's statute of limitations. We do not reach the merits on this issue because it is waived.

The IDEA did not always include a statute of limitations. *See* 20 U.S.C. § 1415(b)(6) (1999). In 2004, Congress added a two-year limitations period, codified in two separate sections of that statute: § 1415(b)(6)(B) and

---

[6] We have recognized our interpretation of the modified *de novo* standard of review "represents the distinct minority position among circuit courts" and "runs counter to the general standard of review suggested in Fed. R. Civ. P. 52(a)." *D.T. ex rel. Yasiris T.* v. *Cherry Creek Sch. Dist. No. 5*, 55 F.4th 1268, 1273 n.5 (10th Cir. 2022) (quoting *Thompson,* 540 F.3d at 1150 n.6). And thus, "[e]n banc reconsideration of our standard of review may well be appropriate at some point." *Id.* No party suggests the standard of review affects the outcome in this appeal.

§ 1415(f)(3)(C).[7] The IDEA permits parents of children with disabilities to present a due process complaint "which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis for the complaint." 20 U.S.C. § 1415(b)(6)(B). A party bringing an IDEA claim "shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C).[8]

---

[7] We have not yet had occasion to interpret how these two statutory provisions should be read together, and we need not do so in this appeal. Some of our sister circuits have considered the matter, however. *G.L.* v. *Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 626 (3d Cir. 2015) (concluding § 1415(b)(6)(B) and § 1415(f)(3)(C) reflect the same two-year limitations period, and therefore "parents have two years from the date they knew or should have known of the violation to request a due process hearing through the filing of an administrative complaint," absent one of the two statutory exceptions found in § 1415(f)(3)(D)); *Avila* v. *Spokane Sch. Dist. 81*, 852 F.3d 936, 937, 939–44 (9th Cir. 2017) (adopting the Third Circuit's reasoning to hold "the IDEA's statute of limitations requires courts to bar only claims brought more than two years after the parents or local educational agency 'knew or should have known' about the actions forming the basis of the complaint"); *Ms. S.* v. *Reg'l Sch. Unit 72*, 916 F.3d 41, 50 (1st Cir. 2019) (same).

[8] The IDEA's statute of limitations tolls under certain circumstances. 20 U.S.C. § 1415(f)(3)(D) (explaining "if the parent was prevented from requesting the hearing due to – (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent[,]" the IDEA's two-year "timeline" shall not apply). The Parents have never argued these tolling provisions apply here.

On appeal, the Parents seem to challenge the dismissal of their 2014 and 2015 claims by contending the IDEA's statute of limitations is not a cap on the remedies that can be awarded when the harm to a student is ongoing. In their reply brief, the Parents make a different argument, suggesting for the first time their 2014 and 2015 claims are not time barred because "the scope and nature" of the School District's actions remained unknown to them until 2017 and 2018. Parents' Reply at 4. Neither argument is properly before us.

Recall, in the administrative proceeding, the School District filed a motion to dismiss the Parents' 2014 and 2015 claims as barred under the IDEA's two-year statute of limitations. The School District argued the "Parents knew or should have known of any alleged deficiencies or denials of FAPE related to [Alex's] 2014-15 and 2015-16 IEPs during the corresponding school years." Vol. 2 at 344. Because the Parents "fail[ed] to plead any facts to support a conclusion that their knowledge arose at a later date," the School District contended dismissal was required. *Id.*

In response, the Parents did not dispute an IDEA claim accrues on the date a party "knew or should have known" about the alleged action that forms the basis of the complaint. Vol. 2 at 389. Nor did the Parents deny knowing about the alleged deficiencies in Alex's IEPs during the 2014 and 2015 school years. They argued only the IDEA's "statute of limitations is not a limitation on the time frame for recovery of damages." Vol. 2 at 389.

14

The ALJ granted the School District's partial motion to dismiss, concluding claims accruing before July 2016 "are outside the statute of limitations." Vol. 6 at 1516:13–18.[9] The ALJ then gave the Parents' counsel an opportunity "to make a record on that ruling." Vol. 6 at 1517:17–19. Counsel declined, responding, "[n]o, Your Honor. I understand." Vol. 6 at 1517:19.

In the district court, the Parents continued to allege the School District failed to provide Alex a FAPE from 2014 to 2018. The Parents did not, however, challenge the ALJ's dismissal of their 2014 and 2015 claims as time barred. Vol. 1 at 40–79. Indeed, the Parents did not mention the IDEA's statute of limitations. As the School District explained in its district court briefing, the Parents made "no arguments about why the ALJ erred in his ruling about the statute of limitations and did not choose to make a record of" any objection when the ALJ granted the partial motion to dismiss. Vol. 1 at 109.

The district court endorsed the ALJ's decision to dismiss the Parents' claims challenging Alex's 2015 and 2016 IEPs. According to the district court, the Parents' due process complaint was filed "more than two years after the completion of the 2014 and 2015 IEPs." Vol. 11 at 2917 (discussing 20 U.S.C.

---

[9] The ALJ emphasized his ruling did not mean "all evidence is cut off at July 2016 because, in many cases, the history of the child's education and the history of his disability . . . is relevant outside of the strict limitations period." Vol. 6 at 1517:10–13. The district court likewise "consider[ed] the contents of the 2014 and 2015 IEPs as evidence to the extent they are relevant to the other claims and defenses in this case." Vol. 11 at 2918.

§ 1415(b)(6)(B)). The district court recognized the Parents had not pursued the statute of limitations issue in their federal action, observing "Alex's parents do not dispute . . . that this Complaint was filed outside the two-year period." *Id.* at 2918.[10]

The Parents spend much of their appellate briefing arguing the IDEA's statute of limitations does not "in any respect alter[] the courts' broad power . . . to provide a complete remedy for the violation of a child's right to a free appropriate public education." Opening Br. at 29 (quoting *G.L.* v. *Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 605 (3d Cir. 2015)). This was the focus of their statute of limitations arguments before the ALJ. But in the district court, the Parents did not raise that argument or otherwise challenge the dismissal of claims that predate July 2016. We thus have no trouble concluding the Parents forfeited on appeal any argument concerning the applicability of the IDEA's statute of limitations. *Havens* v. *Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to

---

[10] While the district court stated the Parents' "*Complaint* was filed outside the two-year period," Vol. 11 at 2917–18 (emphasis added), the district court dismissed only the "challenges to the 2014 and 2015 IEPs [as] time barred," *id.* at 2918.

present before the district court but then subsequently urge on appeal to be forfeited.").[11]

"[W]e will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." *Richison* v. *Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). "If an appellant does not explain how its forfeited arguments survive the plain error standard, it effectively waives those arguments on appeal." *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019); *see also Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court."). The Parents do not mention the plain error standard, let alone attempt to satisfy it.

Nor will we entertain the new argument the Parents summarily assert in their reply brief. The Parents seem to contend, without elaboration, their 2014 and 2015 claims are timely because they did not discover "the scope and

---

[11] We apply traditional forfeiture and waiver rules when reviewing a district court's order in IDEA cases. *L.B. ex rel. K.B.* v. *Nebo Sch. Dist.*, 379 F.3d 966, 975 n.12 (10th Cir. 2004) ("Although Appellants raised the issue of [hearing officer's] alleged bias at the district court, they did not present to the district court any arguments regarding the other purported procedural violations of the IDEA. For that reason, this court declines to address Appellants' other procedural arguments." (citing *Lyons* v. *Jefferson Bank & Trust,* 994 F.2d 716, 721 (10th Cir. 1993))).

nature" of the School District's violations until 2017 and 2018. Parents' Reply at 4. This argument is also waived.

As the School District persuasively argues, the "Parents did not present any evidence or give testimony in the underlying due process hearing or before the district court that they discovered the alleged injuries from [the] 2014-2015 and 2015-2016 school years at a time that would relieve them of their obligation to file a complaint within two years [of the 2014 and 2015 IEPs]." Resp. Br. at 22. We do not consider "late-blooming" arguments raised for the first time in a reply brief. *GeoMetWatch Corp.* v. *Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022); *Anderson* v. *U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.").

We now turn to the Parents' main arguments concerning the 2016 and 2017 school years.

**B**

The Parents claim Alex was denied a FAPE because the School District violated its obligations under the IDEA. In support, the Parents argue (1) the behavioral components of Alex's disabilities were not properly addressed by the School District; (2) Alex did not make progress under his IEPs; (3) Alex's speech-language and occupational therapy were improperly reduced during the 2017 school year; (4) the School District mistakenly concluded Alex was not

eligible for extended school year services; and (5) the School District did not evaluate Alex in all areas of suspected disabilities. Opening Br. at 29–35, 38, 43. We discern no reversible error on this record.

### 1. The School District Appropriately Identified and Addressed Alex's Behavioral Needs.

The Parents contend Alex's 2016 and 2017 IEPs were legally inadequate because the School District failed to identify and address "the functioning" of Alex's behavior—meaning the behavioral aspects of his disabilities. Opening Br. at 32; Vol. 2 at 517 ¶ 10. The ALJ rejected this argument, as did the district court. The district court concluded Alex's 2016 and 2017 IEPs "reflect[ed] a thoughtful consideration of Alex's behavioral strengths and weaknesses, as well as the most appropriate behavioral interventions for Alex's unique circumstances." Vol. 11 at 2927. We agree.

On appeal, the Parents contend the School District was required to conduct a functional behavioral analysis and develop a behavior intervention plan to craft Alex's IEPs in 2016 and 2017. There is no support in the law for this position. "FBAs and BIPs are just examples of the types of tools and strategies that an IEP Team might recommend in a situation where a child's behavior interferes with classroom learning." *D.S. ex rel. M.S.* v. *Trumbull Bd. of Educ.*, 975 F.3d 152, 164 (2d Cir. 2020). The IDEA only *requires* a school district to conduct an FBA and implement a BIP if a student is subject to

19

certain disciplinary actions at school. *See* 20 U.S.C. §§ 1415(k)(1)(E)–(F) (when student's educational placement is changed because of "code of student conduct" violations stemming from "conduct [that] was a manifestation of the child's disability, the IEP Team shall . . . conduct a functional behavior assessment, and implement a behavioral intervention plan"); *Trumbull*, 975 F.3d at 164 ("Only where a child is seriously disciplined for behavior that is a manifestation of their disability is a school required to conduct an FBA and implement or review the child's BIP." (citing §§ 1415(k)(1)(E)–(F))). The record confirms Alex was not disciplined. Thus, as the Parents appear to acknowledge, the School District had no obligation to conduct a functional behavioral analysis or implement a behavioral intervention plan for Alex.[12]

Still, the Parents insist the School District could not appropriately address the behavioral aspects of Alex's disabilities without first using these tools. In support, the Parents rely on 20 U.S.C. § 1414(d)(3)(B)(i), which states an "IEP Team shall . . . [i]n the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."

---

[12] *See* Oral Argument at 4:44–5:31 (Appellants' counsel agreeing that, under the IDEA, a functional behavioral analysis is required only "when the child is removed from class for disciplinary reasons").

*See* Opening Br. at 29. That section does not advance the Parents' argument, however.

The record shows the School District, before developing Alex's 2016 and 2017 IEPs, did consider—but rejected—conducting an FBA. For example, the School District considered an FBA as part of the 2017 Reevaluation but decided it was unnecessary because "the functions of [Alex's] behaviors were well understood." Vol. 2 at 523 ¶ 32. The IEP Team also "unanimously concluded that a separate plan was not needed [for the 2017 school year] because behavioral strategies . . . embedded in multiple sections of the IEP were permitting [Alex] to make progress." Vol. 2 at 525 ¶ 41. And Alex's special education teacher testified that, in 2016, the IEP Team "felt confident helping [Alex] regulate his behavior" without a behavioral intervention plan and "knew what worked for him." Vol. 9 at 2246:23, 2247:7–8. Because of that, the School District "didn't feel that [an FBA] was necessary," especially since one "had never been requested." Vol. 9 at 2246:23–25.[13]

---

[13] The Parents acknowledge the School District ultimately performed an FBA in 2018, and then funded an independent FBA at the Parents' request that same year. Notably, the results of the two FBAs confirmed the School District's understanding of the functions of Alex's behavior in 2016 and 2017. Vol 9 at 2447:12–23 (special education teacher testified the results of the 2018 FBA were "consistent with [her] understanding [of the functions of Alex's behaviors] as well as documentation that [the School District] had seen from outside behavior therapists prior to the FBA."); Vol. 10 at 2653:6–2654:4

Under these circumstances, the School District met its obligations to Alex under the IDEA. *See Elizabeth B. ex rel. Donald B.* v. *El Paso Cnty. Sch. Dist. 11*, 841 F. App'x 40, 42–43 (10th Cir. 2020) (finding school district provided a FAPE because it "considered" an FBA and a BIP but "found them unnecessary");[14] *Lessard* v. *Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 26 (1st Cir. 2008) (concluding school district provided a FAPE when a student's IEP Team "mulled the matter and determined that a behavioral plan was *not* necessary" to provide a FAPE, reasoning "[n]o more was exigible.").

The decision not "to conduct an FBA . . . does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *M.W. ex rel. S.W.* v. *New York City Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013). As the Parents admit, the School District "perform[ed] a number of assessments of Alex and, through those assessments, [it] identified several behaviors that impeded Alex's ability to access learning." Opening Br. at 31–32. The record confirms as much. Alex's 2016 and 2017 IEPs also included specific goals to address his behavioral challenges. We thus cannot say the

---

(school psychologist testified School District did not learn anything new about Alex's behaviors from the independent FBA requested by the Parents).

[14] We rely on unpublished decisions in our analysis only for their persuasive value. *See, e.g., United States* v. *Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

School District failed to identify and address the behavioral aspects of Alex's disabilities. In arguing otherwise, the Parents essentially ask us to choose "the *best* methodology" to address Alex's educational needs, but that "is precisely the kind of issue which is properly resolved by local educators and experts," not an appellate court. *O'Toole*, 144 F.3d at 709 (emphasis added).

### 2.  Alex's IEPs Were Reasonably Calculated to Allow Him to Make Progress.

The ALJ concluded Alex's 2016 IEP "included adequate goals, services, supports, accommodations, and modifications to allow him to make appropriate educational progress." Vol. 2 at 542. As to the 2017 IEP, the ALJ found it also "include[d] the necessary services and supports to permit [Alex] to make meaningful progress in areas of demonstrated need." *Id.* at 544. The district court reached the same conclusion. On appeal, the Parents maintain Alex was denied a FAPE because he failed to make appropriate progress under his IEPs. We are not persuaded.

The Parents' arguments appear to focus on whether Alex progressed *generally* under his IEPs, but that is not the dispositive question. Instead, we must ask—as the ALJ and district court correctly did—whether the IEPs were "*reasonably calculated* to enable [Alex] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S. at 399 (emphasis added); *accord Garcia*, 520 F.3d at 1125 ("[T]he special education services provided to the

23

student [must be] reasonably calculated to enable the child to receive educational benefits[.]"). The "question is whether [an] IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399. "[T]he burden of proof in these matters rests with the party attacking the child's" IEP—here, the Parents. *Johnson ex rel. Johnson* v. *Indep. Sch. Dist. No. 4 of Bixby, Tulsa Cnty., Okl.*, 921 F.2d 1022, 1026 (10th Cir. 1990) (per curiam).

Considered under this standard, the Parents' contentions do not support reversal. The Parents first suggest Alex's 2016 IEP did not sufficiently address the behavioral components of his disabilities because he still had behavioral issues in 2017. But the ALJ correctly determined Alex's 2016 IEP included goals, supports, and accommodations to address his behavioral needs. And we must evaluate IEPs prospectively. An IEP "is not guaranteed to produce any particular outcome." *Rowley*, 458 U.S. at 192. So "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student." *O'Toole*, 144 F.3d at 701–02 (quoting *Carlisle Area Sch.* v. *Scott P.,* 62 F.3d 520, 534 (3d Cir. 1995)). It does not follow that the 2016 IEP was legally inadequate because Alex's behavioral challenges persisted into the 2017 school year. Indeed, the record supports the ALJ's conclusion that it is "possible for [Alex] to progress on his goals even while problem behaviors are still an issue." Vol. 2 at 538 ¶ 98.

24

As to Alex's 2017 IEP, the Parents fault the School District for not sufficiently responding to the behavioral challenges identified in the 2017 Reevaluation. Of course, a school district cannot "ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefits on the student." *O'Toole*, 144 F.3d at 702. But that did not happen here. The record shows the 2017 IEP included additional goals for Alex responsive to the results of the 2017 Reevaluation.

### 3. The School District Provided a FAPE Even Though Alex's Direct Therapy Hours Were Reduced.

In the 2017 IEP, the School District reduced Alex's direct speech-language and occupational therapy hours and increased the number of indirect therapy hours. Direct therapy is "delivered in a one-on-one or small-group setting." Vol. 11 at 2940. Indirect therapy refers to time "in which [Alex's therapists] consulted with his teachers to help them apply speech-language [or occupational therapy] strategies in the classroom beyond Alex's one-on-one therapy time." Vol. 11 at 2940–41.

The ALJ concluded the School District's new "collaborative" service model "increase[d] the amount of instructional time . . . over and above what would have been possible under the previous IEP." Vol. 2 at 543–44. The change "was effective and appropriate," the ALJ reasoned, because "[d]irect

25

service minutes were reduced and indirect minutes were increased to foster a more consultative model where special service providers . . . embed[ded] [Alex's] skills training throughout the instructional day." *Id.* at 543. The district court similarly concluded the School District "provided ample evidence to support its position that the change in Alex's speech-language and occupational therapy time was reasonably calculated to help Alex make progress." Vol. 11 at 2943.

On appeal, the Parents contend Alex was denied a FAPE because of the restructuring of speech-language and occupational therapy services in the 2017 IEP. We disagree. There is no question Alex had substantial speech-language and occupational therapy needs. But we discern no error in the determination by the ALJ and district court that the School District's "collaborative" approach was reasonably calculated to meet those needs.

The Parents also contend the School District's decision to change the quantity of direct-therapy hours was motivated by a general policy for students transitioning to middle school and thus not tailored to Alex's unique educational needs, as the IDEA requires. The record does not support this assertion. The 2017 IEP explained the shift was to support "Alex generalizing his skills across multiple environments" and so the collaborative model would "still provide for the specialized instruction necessary for Alex to make progress on his IEP goals and objectives." Vol. 3 at 689. We thus affirm the

district court's conclusion that, even with the reduced direct therapy hours, Alex's 2017 IEP complied with the IDEA.

### 4. The School District Provided a FAPE Even Though Alex Was Not Provided An Extended School Year.

Extended school year (ESY) services are "special-education and related services" provided "[b]eyond the normal school year" at no cost to a child's parents. 34 C.F.R. § 300.106(b). The ALJ found the School District had no obligation to provide ESY services to Alex since the Parents "asserted their opposition to ESY on the basis of home therapies they would provide." Vol. 2 at 543 n.17. The district court agreed. On appeal, the Parents contend ESY services were necessary to provide Alex a FAPE and thus should have been offered, even if the Parents would have rejected the offer. This argument is unavailing.

"Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, . . . that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(a)(2). These services are "necessary" when "the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program" beyond the normal school year. *Johnson*, 921 F.2d at 1028 (quoting *Alamo Heights Indep. Sch. Dist.* v. *State Bd. of Educ.,* 790 F.2d 1153, 1158 (5th Cir. 1986)). To determine if ESY services are necessary, school districts "should

[consider] not only retrospective data, such as past regression and rate of recoupment, but also . . . predictive data, based on the opinion of professionals in consultation with the child's parents as well as circumstantial considerations of the child's individual situation at home and in his or her neighborhood and community." *Id.*

The record supports the conclusion that the School District provided Alex a FAPE without offering ESY services. Both the 2016 and 2017 IEPs explained Alex did not experience severe regression of learned skills, any regression he did experience was remedied within two weeks, and predictive factors indicated Alex would not regress over any breaks. The Parents maintain Alex's lack of regression during the summer was attributable only to services and therapies they funded privately, so he still needed no-cost ESY services. This argument misunderstands the law. The IEP Team, in determining whether ESY services were necessary, was obligated to consider any "alternative resources" available to the family—including factoring in "the ability of the child's parents to provide the educational structure at home." *Johnson*, 921 F.2d at 1030, n.9; *see also Elizabeth B.*, 841 F. App'x at 44 (rejecting argument that IDEA required school district "to provide no-cost ESY services without regard for whether [parents] planned to pay for" their own because school district must consider "the availability of alternative resources" when determining whether a student needs ESY services). The record shows the IEP

28

Team did just that. We thus see no reason to disturb the district court's conclusion that ESY services were not necessary to provide Alex a FAPE.

### 5.  The School District Appropriately Evaluated Alex In All Areas of Disability.

The Parents contend Alex was denied a FAPE because, in crafting Alex's IEPs, the School District did not appropriately evaluate Alex's autism.[15] The Parents also argue the School District did not determine how best to instruct Alex to communicate using his NovaChat. The ALJ and district court rejected these arguments, and so do we.

When conducting an evaluation or reevaluation, a school district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information [about a child], including information provided by the parent, that may assist in determining" whether

---

[15] To the extent the Parents suggest the School District was obligated to determine *whether* Alex was a student with autism, we disagree on this record. There is no question the School District knew about Alex's autism when he enrolled. The Parents do not say otherwise. The record confirms that as early as his initial school district evaluation in 2014, the School District considered Alex's autism diagnosis. At the administrative hearing, Alex's special education teacher testified "it wasn't ever a question of whether [Alex] had autism . . . so [the School District] didn't feel that it was necessary to perform a diagnostic assessment." Vol. 9 at 2257:13–2258:3. Alex already "had [the] diagnosis of autism," and the School District "saw characteristics of autism," so no one "felt that [it] was an incorrect disability category for him at that time." *Id.* at 2258:1–3. And the 2017 Reevaluation reaffirmed Alex "continue[d] to display . . . behaviors associated with an Autism Spectrum Disorders diagnosis." Vol. 3 at 646.

a child has a disability and the content of a child's IEP. 20 U.S.C. § 1414(b)(2)(A). The record shows Alex's IEPs relied on autism-related assessments and tools. For example, the School District conducted an Assessment of Basic Language and Learning Skills-Revised (ABLLS-R) as part of the 2017 Reevaluation, which is a tool used with children with autism to identify gaps in skill development. Alex's special education teacher explained it is "typical for students with autism to have splintered skills," so while a typical student's skills would consistently progress, "kids with autism tend to have more gaps." Vol. 9 at 2260:25–2261:8. The results of the ABLLS-R can then inform the educational goals used to "fill in those gaps." *Id.* The School District also administered the Verbal Behavior Milestones and Placement Program ("VB-MAPP"), including during the 2017 Reevaluation. The VB-MAPP is a "criterion-referenced assessment tool, curriculum guide, and skill tracking system that is designed for children with autism." Vol. 2 at 549. The evidence before the ALJ also showed it was important for the School District to consider how Alex's other disabilities worked together with his autism to impact his educational needs.

As the ALJ explained, Alex's 2016 IEP was "based on an accurate understanding of [his] unique needs," Vol. 2 at 541–42, and the 2017 IEP "include[d] the necessary services and supports to permit [Alex] to make meaningful progress in areas of demonstrated need," *id.* at 544. The district

court agreed, finding the School District "provided Alex with special education and related services specifically targeting Alex's autism." Vol. 11 at 2940. After reviewing the record, and giving "due weight" to the administrative proceedings—just as the district court did—we see no basis to hold otherwise. *Thompson*, 540 F.3d at 1150.

The Parents next argue Alex was denied a FAPE because the School District did not properly address Alex's functional communication needs. Because the 2017 Reevaluation showed Alex struggled to use his NovaChat, the Parents insist the School District was required to conduct an assistive technology assessment.[16] The ALJ found no evidence to support the Parents' assertion. Vol. 2 at 519 n.6. The district court agreed, finding Alex's IEPs appropriately addressed his speech-language needs. Vol. 11 at 2940. Again, we discern no error.

The record shows Alex worked with a speech-language therapist trained to use the NovaChat, and that therapist instructed Alex's special education teacher and paraprofessionals to use the device. Alex's speech-language

---

[16] In support, the Parents point to 34 C.F.R. § 300.304(b)(1)(ii), which mandates school districts "[u]se a variety of assessment tools and strategies to gather relevant . . . information . . . that may assist in determining . . . [t]he content of the child's IEP." The Parents also rely on 34 C.F.R. § 300.304(c)(7), which requires school districts to use "[a]ssessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided." Opening Br. at 40.

therapist also coordinated with the School District's specialists in assistive technology—the SWAAAC[17] Team—to address Alex's communication needs. The SWAAAC Team's expertise informed the specific goals and support systems used to develop Alex's NovaChat skills. This strategy worked, because, as the ALJ correctly found, Alex became more proficient with his NovaChat. Vol. 2 at 525 ¶¶ 42–43, 544.[18]

Still, the Parents fault the School District for failing to assess "[h]ow best to use [the NovaChat] device, how Alex should be instructed in learning to use the device, [and] how staff should be trained in using the device." Opening Br. at 40. As the Parents explain, the 2017 Reevaluation observed "Alex's expressive skills have not consistently progressed . . . but rather [have] plateaued." Vol. 3 at 649. We do not question the reality of these challenges, but the law does not demand an "ideal" IEP—only one "reasonably" calculated to allow Alex to make progress. *Endrew F.*, 580 U.S. at 399. The Parents have

---

[17] "SWAAAC" means Statewide Assistive Technology, Augmentative, and Alternative Communication. Vol. 2 at 519 ¶ 16 n.6.

[18] We reiterate the adequacy of an IEP is not determined by reference to the particular results it produces. *O'Toole*, 144 F.3d at 701–02. We note Alex's progress here only to make clear this is not a situation where the School District had to take action because Alex's IEPs were "clearly failing" to address his functional communication needs. *Id.* at 702. The Parents do not argue otherwise.

not shown the School District's strategies to improve Alex's functional communication skills using his NovaChat failed to meet this standard.

*\*\**

In sum, in Appeal No. 22-1236 we **AFFIRM** the district court's determination that the School District complied with the IDEA by providing Alex a FAPE.

## III

We now turn to the School District's cross appeal, which presents an issue of first impression in our circuit under 34 C.F.R. § 300.502. That regulation was promulgated to implement §§ 1415(b)(1) and (d)(2)(a) of the IDEA, requiring school districts to provide parents "an opportunity . . . to obtain an independent educational evaluation" of a disabled child. *See* 20 U.S.C. § 1415(b)(1). Section 300.502 governs a parent's right to request an IEE at public expense and a school district's obligation to respond to such a request. The ALJ and district court determined the School District was required under § 300.502(b)(2) to reimburse the Parents for the cost of an independent neuropsychological evaluation conducted in June 2018. The School District contends this ruling was erroneous, and we agree.

## A

Independent educational evaluations, or IEEs, play a critical role in the IDEA framework. As the Supreme Court has emphasized, school districts

"have a 'natural advantage' in information and expertise" compared to parents. *Schaffer*, 546 U.S. at 60 (quoting *Sch. Comm. of Burlington* v. *Dep't. of Ed. of Mass.,* 471 U.S. 359, 368 (1985)). The IDEA counterbalances this advantage by providing parents with the right to an IEE at public expense. *Id.* A publicly-funded independent evaluation ensures parents "are not left to challenge the government . . . without an expert with the firepower to match the opposition." *Id.* at 61.

Section 300.502(b)(1) states that a parent has "the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." When parents exercise that right, a school district has an obligation under § 300.502(b)(2) either to provide the requested IEE or "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate." Subsection 300.502(b)(5) provides a parent "is entitled to only one independent educational evaluation at public expense each time [a] public agency conducts an evaluation with which the parent disagrees."

In August 2017—three years after his initial evaluation—the School District reevaluated Alex as required by the IDEA. *See* 20 U.S.C. § 1414(a)(2)(B). The Parents disagreed with the results of the 2017 Reevaluation. To that end, in February 2018, the Parents requested an IEE at public expense under § 300.502(b)(1), "in the areas of speech and language[]

34

and occupational therapy." Vol. 2 at 526 ¶ 48. The School District funded this IEE, thereby complying with § 300.502(b)(2). A few months later, in June 2018, the Parents requested another IEE at public expense—this time in neuropsychology—to challenge a different aspect of the same 2017 Reevaluation. The School District refused to fund it, insisting the Parents had no right to an *additional* independent educational evaluation at public expense.

The ALJ ordered reimbursement, reasoning the School District failed to comply with § 300.502(b)(2). The district court agreed. Neither the ALJ nor the district court considered how § 300.502(b)(5) impacted the School District's obligations as to the June 2018 IEE.

**B**

On appeal, the School District argues the ALJ and district court erred as a matter of law because 34 C.F.R. § 300.502 only requires a school district to fund one independent educational evaluation each time a public agency conducts an evaluation with which the parent disagrees. Reimbursement for the June 2018 IEE was ordered in error, the School District contends, because the School District had already funded an IEE earlier that year concerning the same school district evaluation. We agree.

The plain text of the regulation supports the School District's position. *Jake's Fireworks Inc.* v. *Acosta*, 893 F.3d 1248, 1261 (10th Cir. 2018) ("The

35

plainness or ambiguity of [regulatory] language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the [regulation] as a whole." (quoting *Nat'l Credit Admin. Bd.* v. *Nomura Home Equity Loan, Inc.*, 964 F.3d 1199, 1226 (10th Cir. 2014))).

Subsection 300.502(b)(1) speaks of "*an* independent educational evaluation at public expense." 34 C.F.R. § 300.502(b)(1) (emphasis added). With respect to the 2017 Reevaluation, the Parents requested and received such a publicly funded IEE in February 2018. The June 2018 IEE was the second request concerning the 2017 Reevaluation.[19] And § 300.502(b)(5) by its terms makes

---

[19] The Parents seem to suggest the June 2018 IEE was not a request for a second IEE, but only a request for a "psycho-educational *assessment*." Parents' Reply at 25–26 (emphasis added); *see also* 34 C.F.R. § 300.15 (defining an evaluation as "procedures used . . . to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs."); 20 U.S.C. § 1414(b) (defining assessments as tools used during an evaluation or re-evaluation to ensure a child is evaluated in "all areas of suspected disability" and to determine "an appropriate educational program for the child."); *T.P. ex rel. T.P.* v. *Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1291 n.13 (11th Cir. 2015) ("The IDEA specifies that the term 'evaluation' is a process during which assessments occur.").

There is no support in the record for this contention. The ALJ concluded the Parents requested two separate IEEs challenging the same 2017 Reevaluation. First, the ALJ found the Parents, in February 2018, requested an IEE "in the areas of speech and language, and occupational therapy." Vol. 2 at 526 ¶ 48. The February 2018 IEE contained multiple assessments designed to gather information about Alex's speech and language abilities. Second, the ALJ found, in June 2018, the Parents requested an "IEE in neuropsychology." Vol. 2 at 535 ¶ 86; Vol. 2 at 543. The neuropsychological IEE, the ALJ explained, likewise included assessment in multiple areas, such

clear the Parents were entitled to "only one" IEE at public expense per school district evaluation. 34 C.F.R. § 300.502(b)(5). Under these circumstances, where the Parents had no right to request or receive a second IEE at public expense under § 300.502(b)(1), the School District had no obligation to respond to the request under § 300.502(b)(2) either by bearing the cost or filing a due process complaint. The contrary conclusion reached by the ALJ and district court does not account for § 300.502(b)(5), and thus cannot be squared with what 34 C.F.R. § 300.502, in its entirety, plainly provides. *See Time Warner Ent. Co., L.P.* v. *Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1053 (10th Cir. 2004) ("[W]e interpret the language of regulations as we construe the language of statutes; accordingly, we must read the regulations such that every word is operative."); *United States* v. *Diaz*, 989 F.2d 391, 392 (10th Cir. 1993) ("[I]t is a 'fundamental rule of statutory construction that all parts of a statute must be read together.'" (quoting *United States* v. *Gordon*, 961 F.2d 426, 431 (3rd Cir. 1992))); *Kircher* v. *Putnam Funds Tr.*, 547 U.S. 633, 643 (2006) ("[W]e do not read statutes in little bites.").

The regulatory history amplifies our conclusion. Subsection 300.502(b)(5) was added to "*clarify* that a parent is entitled to only one IEE each time the public agency conducts an evaluation with which the parent

---

as "cognition, academic achievement, attention and memory, language, and social/emotional needs." *Id.* at 535 ¶ 87.

disagrees." Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 FR 46540 at 46690 (2006) (emphasis added). This clarification reaffirmed "a parent's statutory right to an IEE at public expense, while recognizing that public agencies should not be required to bear the cost of more than one IEE when a parent disagrees with an evaluation conducted or obtained by the public agency." *Id.* As the regulatory history indicates, it was not originally clear parents were only entitled to one publicly-funded IEE per school district evaluation. But the addition of § 300.502(b)(5)—which the ALJ and district court may have inadvertently overlooked—leaves no doubt our reading of the regulation is correct.

Thus, we hold the IDEA and its implementing regulations imposed no duty on the School District to fund the Parents' request for a second IEE in response to the 2017 Reevaluation or file a due process complaint to resist that request. Though we have not encountered much case law on this issue, persuasive authority from our sister circuits further supports our view. *See T.P. ex rel. T.P.* v. *Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1291 n.13 (11th Cir. 2015) (explaining, under § 300.502(b)(5), a parent may obtain "an IEE at public expense, singular, not IEEs, plural" in response to each school district evaluation); *M.S.* v. *Hillsborough Twp. Pub. Sch. Dist.*, 793 F. App'x 91, 94 (3d Cir. 2019) (finding, under § 300.502(b)(1), a parent's "right to request a publicly

funded IEE never arose" so the school district "had no duty to request a due process hearing" to challenge a parent's request for one); *Hudson ex rel. Tyree* v. *Wilson*, 828 F.2d 1059, 1065–66 (4th Cir. 1987) (rejecting argument that a school district must reimburse a student's family for multiple IEEs because, "§ 300.503(b) in terms limits reimbursement to a single evaluation").[20]

Accordingly, in Cross-Appeal No. 22-1250 we **REVERSE** the district court's order requiring the School District to reimburse the Parents for the second IEE requested in June 2018.

**IV**

In sum, in Appeal No. 22-1236 we **AFFIRM** the district court in full. The Parents waived any challenge to the dismissal of their claims challenging Alex's 2014 and 2015 IEPs. And we agree the School District fulfilled its obligations under the IDEA by providing Alex a FAPE during the 2016 and 2017 school years. In Cross-Appeal No. 22-1250, we conclude the district court erred by requiring the School District to reimburse the Parents for the neuropsychological IEE in June 2018. We therefore **REVERSE** the district court's reimbursement order.

---

[20] *Hudson* predates the addition of § 300.502(b)(5). We nevertheless find it persuasive.